**In re: EXPLORER PIPELINE COMPANY, a Delaware corporation.**

**No. C.A. 18749.**

Court of Chancery of Delaware, New Castle County.

Submitted: June 28, 2001.
Decided: July 16, 2001.

---

Peter J. Walsh, Jr., Esquire, John F. Grossbauer, Esquire, Kevin R. Shannon, Esquire, Michael A. Pittenger, Esquire,

John M. Seaman, Esquire, and Rebecca L. Scalio, Esquire of Potter Anderson & Corroon, LLP, Wilmington, Delaware, Attorneys for Petitioner Explorer Pipeline Company.

Neal C. Belgam, Esquire, Michael D. DeBaecke, Esquire, Steven L. Caponi, Esquire and Elizabeth A. Wilburn, Esquire of Blank Rome Comisky & McCauley LLP, Wilmington, Delaware, and Alan M. Lieberman, Esquire of Blank Rome Comisky & McCauley LLP, Philadelphia, Pennsylvania, Attorneys for Respondent Marathon Oil.

Collins J. Seitz, Jr., Esquire and Samuel D. Brickley, II, Esquire of Connolly, Bove, Lodge & Hutz LLP, Wilmington, Delaware, and John G. Harkins, Jr., Esquire, Eleanor Morris Illoway, Esquire, David J. Creagen, Esquire and David W. Engstrom, Esquire of Harkins, Cunningham, Philadelphia, Pennsylvania, Attorneys for Respondent Sun Pipe Line Company of Delaware.

Richard H. Morse, Esquire of Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware, and Nathan P. Eimer, Esquire, Pamela R. Hanebutt, Esquire, Adam M. Deutsch, Esquire, and Vanessa G. Jacobsen, Esquire, of Eimer, Stahl, Klevorn and Solberg, Chicago, Illinois, Attorneys for Respondent CITGO Pipeline Company.

Paul M. Lukoff, Esquire and David E. Brand, Esquire, of Prickett, Jones & Elliott, Wilmington, Delaware, Attorneys for Respondents Equilon Pipeline Company and TRMI Holdings, Inc.

Lawrence C. Ashby, Esquire, Philip Trainer, Jr., Esquire and Carolyn S. Hake, Esquire of Ashby & Geddes, Wilmington, Delaware, Attorneys for Respondent Chevron Pipeline Company.

Charles F. Richards, Jr., Esquire, J. Travis Laster, Esquire and Andrea Short,

Esquire of Richards, Layton & Finger, Wilmington, Delaware, Attorneys for Respondent Conoco Pipeline Company.

Brett D. Fallon, Esquire, Morris, James, Hitchens & Williams, Wilmington, Delaware, Attorney for Respondent Phillips Investment Company.

## MEMORANDUM OPINION

NOBLE, Vice Chancellor.

### I. INTRODUCTION

Petitioner Explorer Pipeline Company ("Explorer") owns and operates a pipeline system for delivery of petroleum products from the Gulf Coast to the Midwest. Explorer's board has approved a major expansion of its pipeline throughput capacity, the cost of which will significantly exceed $100 million. Explorer proposes to finance the expansion project through an operating lease format. The operating lease format was chosen to avoid a provision in Explorer's certificate of incorporation which, *inter alia*, requires it to obtain approval by a supermajority (75%) vote of its common stock by its shareholders before it can "incur, create, assume or guarantee any indebtedness for borrowed money" that would result in the aggregate indebtedness exceeding $15 million. Three shareholders, holding more than 33% of Explorer's stock, oppose the project and have asserted that supermajority shareholder approval must be obtained.

Confronted with this opposition, Explorer brought this declaratory judgment action against its eight shareholders, each of which is a major integrated oil company or an affiliate of such a company, to determine if it must obtain supermajority shareholder approval of the operating lease format to proceed with the project.

The Respondents and their respective percentage holdings of Explorer's common stock are as follows:

| | |
|---|---|
| Chevron Pipeline Company ("Chevron") | 16.90% |
| CITGO Pipeline Investment Company ("CITGO") | 6.80% |
| Conoco Pipeline Company ("Conoco") | 7.71% |
| Equilon Pipeline Company, LLC ("Equilon") | 26.00% |
| Marathon Oil Company ("Marathon") | 17.36% |
| Phillips Investment Company ("Phillips") | 6.07% |
| Sun Pipe Line Company of Delaware ("Sun") | 9.40% |
| TRMI Holdings, Inc. ("TRMI") | 9.97% [1] |

Marathon, CITGO, and Sun (collectively the "Opposition Respondents") oppose the expansion project.

Explorer has now moved for summary judgment. In this Memorandum Opinion, I conclude that Explorer is entitled to partial summary judgment by finding that the operating lease format, as authorized by the board and as generally amplified by the negotiated draft lease documents, is not subject to the supermajority shareholder approval provided in its certificate of incorporation. I, however, decline to reach certain equitable claims tendered by the Opposition Respondents and leave their resolution to another day.

### II. STATEMENT OF FACTS [2]

#### A. Explorer.

Explorer, incorporated as a Delaware corporation in 1967, has its headquarters in Tulsa, Oklahoma. It owns and operates a 1,400 mile interstate common carrier pipeline for the transport of petroleum products. The mainline pipeline runs from Port Arthur, Texas to Tulsa, Oklahoma to Hammond, Indiana. The system has been in operation since the early 1970's.

---

1. Equilon and TRMI are affiliated through a joint venture of Shell Oil Company and Texaco, Inc.

2. This Statement of Facts is drawn primarily from the Affidavit of Curtis L. Craig ("Craig Aff."). The facts that are material to the Court's disposition of the pending motion are not in dispute.

Explorer has eight directors. Seven of the directors are affiliates of seven of the Respondents—Chevron, Conoco, Equilon, Marathon, Phillips, Sun and TRMI. CITGO does not have a representative on the Explorer board; its representative, who was a board member until he was recently not reelected, now attends board meetings in a non-voting capacity. In his place, the president of Explorer was elected as the eighth director.

The corporate dynamics are somewhat unusual. Explorer competes with its shareholders who, in turn, compete among themselves. The shareholders and their representatives on the Explorer board are sophisticated, knowledgeable, and experienced in the pipeline industry.

### B. Explorer's Certificate of Incorporation.[3]

Explorer's motion for summary judgment requires construction of Article EIGHTH, paragraph (d) of Explorer's certificate of incorporation, which provides in part:

> EIGHTH: In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized by the affirmative vote of three-fourths of the whole board:
>
> \* \* \*
>
> (d) To incur, create, assume or guarantee any indebtedness for borrowed money, including the execution or creation of mortgages and liens in connection therewith upon the real and personal property of the Corporation; provided the outstanding balance of indebtedness approved by the Board of Directors does not exceed fifteen million dollars ($15,-000,000) and in the event the Board approved total outstanding indebtedness equals fifteen million dollars ($15,000,-

000), then no further indebtedness or mortgage or lien in connection therewith shall be incurred, created, assumed or guaranteed by the Corporation unless authorized by the affirmative vote of the holders of at least seventy-five per cent of the stock issued and outstanding having voting power; provided however if one Stockholder's issued and outstanding stock exceeds 25% and that Stockholder either votes or acts negatively or withholds its vote or action, the affirmative vote or action of all other Stockholders shall be sufficient to constitute affirmative action by the Stockholders; . . . . [4]

This provision requires supermajority approval by the board and by the shareholders before the board may subject Explorer to certain indebtedness.

Explorer's certificate contains a general grant of power as set forth in another portion of Article EIGHTH, which provides:

> The Board of Directors, in addition to the powers and authority expressly conferred upon it hereinbefore or by statute and by the By–Laws, is hereby empowered to exercise such powers as may be exercised by the Corporation; subject, nevertheless, to the provisions of the statutes of the State of Delaware and of this Certificate of Incorporation. Except as otherwise required by this Article EIGHTH, the By–Laws or by law, the Board of Directors may exercise any of its powers by the affirmative vote of a majority or a quorum thereof.

The Explorer certificate of incorporation also contains other common grants of authority, such as paragraph (b)(2) of Article THIRD, which confers express authority "[t]o purchase, receive, take by grant, devise, bequest or otherwise, lease or other-

---

**3.** Explorer's certificate of incorporation appears as Ex. A to the Craig Aff.

**4.** For convenience, I sometimes refer to this paragraph as the "supermajority provision."

wise acquire (by means including but not limited to condemnation ...), own, hold, construct, ... maintain, operate, use and otherwise deal in and with ... all real and personal property of every class and description..."

Paragraph (b)(4) of Article THIRD furthermore grants authority "[t]o acquire by purchase, lease, or otherwise, all or any part of the property, real and personal, tangible or intangible, of any nature whatsoever, including good will, business and rights of all kinds, of any other corporation or of any person, firm or association...."

Finally, paragraph (b)(1) of Article THIRD expressly empowers the board to:

build, construct, equip, purchase, *lease*, or otherwise acquire, hold, own, control, maintain, and operate *pipelines*, pipes, tubes, conduits, conveyors, ...or other conveyances, tanks, *storage facilities*, compressors, *pump stations*, booster stations, control stations, buildings, and improvements, and all other necessary or desirable facilities, equipment, and appurtenances ... for the receipt, gathering, transportation, carriage, conveyance, storage, handling, measuring, purchase, sales, marketing, and distribution of crude petroleum and the products and by-products thereof.... (emphasis added)

With these provisions in mind, I now turn to the history of the project that has resulted in this dispute.

C. Expansion of the Mainline Pipeline.

Expansion of Explorer's mainline pipeline has been considered off and on for approximately seventeen years. As a common carrier, Explorer must reduce all shippers' volumes ratably in order to match capacity when the shippers' desired volumes exceed Explorer's capacity. Seasonally since 1984 and almost continuously for the last two and one-half years, Explorer has been required to prorate its capacity.

At a stockholders meeting in September 1999, the stockholders directed the board to consider again expansion of the mainline. During the ensuing months, Explorer addressed engineering and regulatory issues associated with an expansion, and management presented various expansion options to the board during 2000.

By October 12, 2000, the board was finally prepared to authorize an expansion of the mainline. It recommended to the stockholders that an expansion project be financed with short-term and long-term notes to be issued by Explorer. At a stockholders' meeting that day, the proposed debt financing of the expansion project failed to receive the support of 75% of Explorer's issued and outstanding stock. The board then reconvened and was provided with, among other things, an opinion from its Delaware counsel regarding use of an operating lease to accomplish the expansion.

The board met on December 12, 2000, to consider again mainline expansion. It revoked the October 12 approval and approved an expansion project costing in excess of $100 million, but approximately 23% less than the one approved two months earlier.[5] Expenditure of available cash was authorized for engineering and permitting of the expansion. Evaluation of the funding alternatives was delayed until the Respondents' financial representatives could meet.

The financial representatives met on February 8, 2001, and reviewed alternatives that included short and long-term debt, capital leasing, off-balance sheet operating leasing, retained earnings and equity funding. No recommendation was

---

5. The expansion of capacity is accomplished with new pump stations (not a larger pipe-line) and additional tankage. The same pipelines will move product more quickly.

made, but traditional debt and operating leasing emerged as the more likely possibilities.

On March 8, 2001, the board convened to review the various financing alternatives. Recognizing that the supermajority vote needed to issue traditional debt could not be obtained, the board decided to approach the expansion through an operating lease arrangement. Explorer management was authorized to negotiate an operating lease for the expansion conditioned upon satisfying operating lease criteria to comply with certain accounting and tax requirements. This effort was subject to further board approval.

At the board meeting on March 21, 2001, a term sheet entitled "Construction Agency Agreement and Operating Lease" ("Term Sheet"),[6] which set forth the basic terms and conditions for the operating lease format for financing the expansion, was approved by the board. At that meeting (if it had not earlier), it became apparent that at least one shareholder believed that supermajority approval by the shareholders was required for the operating lease format as well. That led to the board's decision to seek a declaratory judgment in this Court regarding the board's authority to proceed with the expansion project under an operating lease. Since the filing of this action, Explorer has moved forward and, apparently, is now close to being able to consummate the transaction although "final" documents are not yet available.

## D. Operating Lease Format.

Explorer developed and investigated the concept of using an operating lease for funding the expansion of system capacity because of its inability, which it anticipated in advance, to obtain the necessary level of shareholder approval to satisfy the supermajority provision for traditional debt. Explorer management interviewed potential credit facilitating firms and negotiated with and selected the firm, The CIT Group, Inc., that would structure and secure the funding for the project.[7] Explorer was actively involved in negotiating the financial terms, such as interest rates. In short, as one would expect with a transaction of this nature, Explorer, as the entity that will construct and operate the improvements, will bear the ultimate risk that the improvements will satisfy its operational goals, and will make the payments that are the sole source of funds to pay back both equity and debt investors, has been intimately involved throughout the process.

A very general and somewhat simplistic explanation of the operating lease concept may be helpful. During the construction period, the project will be owned by a trust (the "Trust") created especially for the project. Explorer, through a construction agency agreement, will agree with the Trust to construct or cause the construction of the project.[8] The Trust will obtain the necessary funding—consisting of both debt and equity investment. The Trust will be the borrower of the construction loans. When construction is completed, the construction financing will convert to operating lease financing. The Trust will continue as the owner of the project but, as lessor, will enter into an operating lease with Explorer, as lessee. Explorer will make rent payments on a "triple net" basis

---

6. Craig Aff., Ex. BB.

7. The Term Sheet and CIT's proposal, dated March 15, 2001 (KPMG Dep., Ex. 8), set forth a description of how the operating lease format would work.

8. The Court's use of phrases such as "operating lease format" should be understood to include, when used generally, both the construction and operation phrases as component parts of an integrated effort.

to the Trust. Thus, operating and maintenance expenses, insurance, and taxes will be paid by Explorer. The lessee's rental payment obligations are said to be on a "Hell or high water" basis meaning that the duty to pay the rent when due is absolute. The rent payments will be divided among debt service payments to the lenders and rent to the equity investors. Explorer under certain conditions, will have the option to purchase the Trust's interest in the project and to assume the Trust's debt to the lenders. The lease will have a base term of 30 years.

The only source of funding for both the equity investors and the lenders will be the payment of rent by Explorer. Because the operating lease is the source of all funding, Explorer will not enter into the transaction unless it is in agreement with the means by which the rent is to be established. For example, it will need to concur with the interest rate (or the formula to calculate the interest rate) to be paid to the lenders by the Trust on the Trust's borrowings.

### III. THE CONTENTIONS OF THE PARTIES

Explorer, by its motion for summary judgment, seeks a determination that "a true operating lease does not require the supermajority approval of the Board of Directors or the stockholders of Explorer pursuant to Article EIGHTH of its Certificate of Incorporation." [9]

Explorer asserts that there are no material issues of disputed fact, that the supermajority provision is not ambiguous, and that its reading of the supermajority provision should be sustained as a matter of law. In short, Explorer maintains that it does not need approval by 75% of the Explorer stock in order to implement the project through an operating lease format.

Opposition Respondents challenge the motion by contending that it is not ripe for adjudication, that the supermajority provision is ambiguous and requires extrinsic evidence for interpretation, that the supermajority provision is not ambiguous and must be construed in accordance with its terms to prohibit the operating lease transaction proposed by Explorer, and that by invoking several equitable claims, many of which involve the process by which the operating lease format was adopted or is to be implemented, Explorer does not have the right to the relief which it seeks.[10] Opposition Respondents also contend that the economic substance of the proposed operating lease transaction constitutes substantially the same risk as that from which they sought protection in the form of the supermajority provision. In short, they are claiming that a vote of 75% of the shares of Explorer must be in favor of the project before Explorer can implement it through an operating lease format.

### IV. ANALYSIS

A. Applicable Standard.

Explorer has moved for summary judgment under Court of Chancery Rule 56(c). Summary judgment may be granted when the moving party demonstrates that there

---

9. The relief ostensibly sought by Explorer has drifted during the course of the proceedings. For example, the relief now sought may be viewed as broader than that sought in Explorer's amended complaint which asked for an order "declaring that approval of an operating lease transaction in connection with the Project does not require the vote of three-fourths of the members of Explorer's Board of Directors or the holders of at least 75% of the outstanding stock of the Company pursuant to paragraph (d) of Article EIGHTH of the Company's Charter."

10. The "equitable claims" are not reached in this Memorandum Opinion but are identified in part at p. 723, *infra*.

are *no* material issues *of fact* and *it is* entitled to judgment as a matter of law.[11]

### B. Ripeness.

 The Opposition Respondents have, from the inception of this litigation, argued that this matter is not ripe for adjudication and that the Court should not give an advisory opinion on a hypothetical transaction.[12] When this action was filed, the transactional documents were not in draft form and apparently even now are not in final form. However, the board's resolution authorizing the transaction had been adopted and the Term Sheet set forth the basic framework of the proposed transaction. The validity of the board action (or perhaps, more accurately, whether the supermajority shareholder approval was required) had been questioned. Thus, at that point, there existed a significant question of corporate governance (as opposed to a question seeking the judicial blessing of a complex commercial transaction as it evolved).[13] To have waited until the transaction documents were all in final form (recognizing that they could be amended anyway) would have defeated the purposes of the Declaratory Judgment Act[14] and unnecessarily delayed either implementation of the expansion project or corporate recognition that the project was not to be implemented, at least in the form of an operating lease. Additionally, with the benefit of reasonably advanced drafts of the transaction documents that are avail-

able, there now is a substantial context against which the proposed transaction can be generally assessed. In sum, Explorer's application presents significant issues that are ready for adjudication.

Moreover, Opposition Respondents have filed for a temporary retraining order and a preliminary injunction to prevent implementation of the operating lease transaction. If they believe that the process is to the stage where injunctive relief is necessary and proper (and argue that supermajority approval should have been obtained), then judicial review of the operating lease approach employed by Explorer, even in the absence of final documents, is appropriate and, indeed, necessary to resolve issues raised by the Opposition Respondents in their motion for interim injunctive relief.

### C. Applicable Principles of Construction.

 Certificates of incorporation are not only contracts among a corporation and its shareholders, but also are contracts among the shareholders.[15] Thus, Delaware courts employ general principles of contract interpretation in construing certificates of incorporation.[16] The Court first reviews the language of the contract to determine if the intent of the parties can be ascertained from the express words chosen by the parties or whether the terms of the contract are ambiguous.[17] Unless the contract language is ambigu-

---

11. *Williams v. Geier*, Del.Supr., 671 A.2d 1368, 1375 (1996).

12. *See Stroud v. Milliken Enterprises, Inc.*, Del.Supr., 552 A.2d 476, 480 (1989); *CRI Insured Mortgage Ass'n., Inc. v. AIM Capital Management Corp.*, Del.Ch., C.A. No. 11597, Jacobs, V.C., 1990 WL 212293 (Dec. 20, 1990).

13. *See Carteret Bancorp, Inc. v. Home Group, Inc.*, Del.Ch., C.A. 9380, mem.op. at 2, Allen, C., 1988 WL 3010 (Jan. 13, 1988).

14. 10 *Del. C.* Ch. 65.

15. *See Morris v. American Public Utilities Co.*, Del.Ch., 122 A. 696, 701 (1923).

16. *Kaiser Aluminum Corp. v. Matheson*, Del. Supr., 681 A.2d 392, 395 (1996); *In re Bicoastal Corp.*, Del.Supr., 600 A.2d 343, 350 (1991).

17. *Supermex Trading Co., Ltd. v. Strategic Solutions Group, Inc.*, Del.Ch., C.A. No. 16183, mem.op. at 7, Lamb, V.C., 1998 WL 229530 (May 1, 1998).

ous, "extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity." [18] The Court, however, cannot conclude that a contract is ambiguous unless it is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings." [19] Once the Court determines that the language is ambiguous, then "all objective extrinsic evidence is considered: the overt statements and acts of the parties, the business context, prior dealings between the parties, and other business customs and usage in the industry." [20] The Court, of course, must construe the contract, in this case the certificate of incorporation, "as a whole" to reconcile, if possible, all of its provisions. [21]

The business and affairs of a Delaware corporation are to be managed by its board of directors. [22] When shareholder approval is required, the democratic majority of the shares present generally controls. [23] Delaware law allows supermajority provisions which provide the minority the power to thwart the will of the majority in order to address certain specific concerns for which the minority has obtained protection. However, supermajority provisions in a certificate of incorporation, because they are at odds with the "fundamental principles of majority rule," must be "clear and unambiguous." [24] Accordingly, supermajority provisions "should be strictly construed to afford full affect to their terms but should not be extended by liberal interpretation." [25]

### D. The Supermajority Provision.

In the absence of the supermajority provision, the Explorer board could implement the project through an operating lease. [26] Article THIRD, paragraph (b)(1) of the certificate of incorporation, empowers the board, *inter alia*, to lease pipelines, pump stations, and storage facilities. The project, structured for acquisition purposes as an operating lease, involves a lease for pump stations and storage facilities. As such, entering into an operating lease transaction would ordinarily be a corporate action that could be authorized by the board alone. Accordingly, I turn to the supermajority provision.

The principal question is whether the proposed operating lease arrangement will

**18.** *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*, Del.Supr., 702 A.2d 1228, 1233 (1997); *Cincinnati SMSA, L.P. v. Cincinnati Bell Cellular Systems Co.*, Del.Supr., 708 A.2d 989, 993, n. 19 (1998).

**19.** *Rhone–Poulenc Basic Chemicals Co. v. American Motorists Insurance Co.*, Del.Supr., 616 A.2d 1192, 1196 (1992). "Merely because the thoughts of party litigants may differ relating to the meaning of stated language does not in itself establish in a legal sense that the language is ambiguous." *Standard Power & Light Corp. v. Investment Assoc., Inc.*, Del.Supr., 51 A.2d 572, 576 (1947); *accord Kaiser Aluminum Corp. v. Matheson*, 681 A.2d at 395.

**20.** *Bell Atlantic Meridian Systems v. Octel Communications Corp.*, Del.Ch., C.A. No. 14348, mem.op. at 14, Allen, C., 1995 WL 707916 (Nov. 28, 1995).

**21.** *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d at 395; *E.I. duPont de Nemours & Co. v. Admiral Insurance Co.*, Del.Super., 711 A.2d 45, 61 (1995).

**22.** 8 *Del. C.* § 141.

**23.** 8 *Del. C.* § 216(2). Directors, unless provided otherwise, are elected by a plurality of the shares present. 8 *Del. C.* § 216(3).

**24.** *Centaur Partners, IV v. National Intergroup, Inc.*, Del.Supr., 582 A.2d 923, 927 (1990).

**25.** *Cinerama, Inc. v. Technicolor, Inc.*, Del. Ch., 663 A.2d 1134, 1155 (1994), *aff'd*, Del. Supr., 663 A.2d 1156 (1995).

**26.** The Court does not understand the Opposition Respondents to contend otherwise.

cause Explorer to "incur, create, assume or guarantee any indebtedness for borrowed money." If so, and if the indebtedness exceeds $15 million (which it will), then the supermajority constraint applies.

Although the overall transaction involves "borrowed money," no money will be borrowed by Explorer. Instead, the borrower of the money will be the Trust. The Trust, however, will be able to repay the borrowed money only if Explorer makes lease payments to it.

Opposition Respondents argue that the lease structure constitutes "indebtedness" because of Explorer's unconditional obligation to pay under the lease.[27] They point out that although the operating lease may be treated as a lease for accounting purposes, economic reality dictates that it be treated as debt. Dr. Stewart C. Myers, a professor of finance at the Massachusetts Institute of Technology and an expert retained by the Opposition Respondents, has opined that "[i]t is clear that the proposed lease is debt in disguise."[28] In support of his opinion, he reports that credit agencies will treat obligations under an operating lease as indebtedness because they are financing vehicles and their economic consequences are important to understanding the "true credit picture of a company."[29] This is because Explorer will make regular payments out of its cash flow over many years, will bear the risk that the improvements will fail to meet its objectives, and confront the practical consequences equivalent to a substantial debt obligation.[30]

Although Explorer may cling to its position that the lease obligation will not constitute indebtedness, Explorer's general counsel, during his deposition, conceded the point:

Q. [Ms. Hanebutt] He [Mr. Pittenger] poses a question in the third photograph (sic), and I quote, "Does the Company equate 'indebtedness for borrowed money' with indebtedness pursuant to long term and short term promissory notes?" Do you see that?

A. [Mr. Craig] Yes.

Q. How did you answer that question?

A. I don't recall, but it is my opinion that indebtedness for borrowed money includes long-term and short-term promissory notes.

Q. Is an obligation to pay lease payments for thirty years a debt in your opinion?

* * *

A. Yes. It's not an indebtedness for borrowed money.

Q. But it is a debt?

A. Yes.[31]

Accordingly, for purposes of this analysis, I conclude that Explorer's operating lease obligations should be treated as indebtedness under the supermajority provision. I now turn to the question of whether this "indebtedness" will trigger the supermajority provision.

In order to give full effect to the language of the introductory clause of the

---

27. The Opposition Respondents cite *Corhran v. Mayor and Council of Middletown,* Del.Ch., 125 A. 459, 460 (1924); *Fenton v. Board of Trustees,* 203 Ill.App.3d 714, 148 Ill.Dec. 799, 561 N.E.2d 105, 110 (1990); *Stillwell Enterprises, Inc. v. Interstate Equipment Co.,* 300 N.C. 286, 266 S.E.2d 812, 817–18 (1980).

28. Affidavit of Stewart C. Myers, ¶ 5 ("Myers Aff.").

29. Myers Aff., ¶ 18.

30. *See Myers Aff.,* ¶ 14 for a detailed analysis of the practical considerations that support the conclusion that the lease payment obligations should be construed as indebtedness.

31. Deposition of Curtis Lee Craig, pp. 123–24.

supermajority provision, each of the four formulations (i.e., incur indebtedness for borrowed money, create indebtedness for borrowed money, assume indebtedness for borrowed money, and guarantee indebtedness for borrowed money) must be considered.

To "incur" means "to become liable for." [32] Under the proposed transaction, Explorer will become liable for lease payments. It, however, will not become liable for "borrowed money." The obligation to repay the borrowed money will not be Explorer's obligation. To read the supermajority provision otherwise would render the phrase "for borrowed money" meaningless and violate the mandate to attempt to give meaning to all pertinent contractual language. [33] Thus Explorer, through the proposed lease transaction, will not incur indebtedness for borrowed money.

To "assume" means to take on, become bound as another is bound, or put oneself in place of another as to an obligation or liability. [34] Explorer is neither "stepping into the shoes" of the borrower nor substituting itself for the borrower in the credit structure. [35] Thus, the operating lease arrangement does not constitute assumption of indebtedness by Explorer.

To "guarantee" is to "promise to answer for the payment of some debt or the performance of some obligation by another on the default of [a third party] who is liable in the first interest." [36] Explorer, as the "deep pocket" supporting the project and as the ultimate source of funds with which payment of the indebtedness will be made, may be viewed as having an economic responsibility comparable to that of a guarantor. However, Explorer is not a guarantor, as that term is commonly understood, because it does not have any obligation to pay that materializes upon the default of the primary obligor and because it does not have any obligation to pay off the borrowed money. Instead, its duty is to make lease payments. [37]

To "create" has been defined as "to bring into being; to cause to exist; to produce; as, to create a trust, to create a corporation." [38] While the meaning of create is clear, this is the most difficult of the four formulations to interpret because the other three—incur, assume and guarantee—are commonly associated with indebtedness. Opposition Respondents contend that Explorer initiated the project, developed the operating lease concept, selected the financing entity, and negotiated trans-

**32.** *Sorensen v. The Overland Corp.*, D.Del., 142 F.Supp. 354, 361 (1956), *aff'd*, C.A.3, 242 F.2d 70 (1957); *Bejger v. Shreeve*, Del.Super., C.A. No. 95C–06–104 WTQ, mem.op. at 6, n. 16, Cooch, J., 1997 WL 524064 (May 7, 1997).

**33.** *See Kaiser Aluminum Corp. v. Matheson*, 681 A.2d at 395; *Berdel, Inc. v. Berman Real Estate Management, Inc.*, Del.Ch., C.A. No. 13579, mem.op. at 8, Jacobs, V.C., 1997 WL 793088 (Dec. 15, 1997).

**34.** *Pipe Welding Supply Co., Inc. v. Gas Atmospheres, Inc.*, N.D.Ohio, 201 F.Supp. 191, 199 (1961).

**35.** The Opposition Respondents do not seriously urge that the operating lease involves the assumption of indebtedness by Explorer. Indeed, they argue that, because it would be cheaper for Explorer to be the primary bor-

rower (as contrasted with being the lessee), they will be economically coerced by their own self-interest to agree for Explorer to assume the debt to be borrowed by the Trust.

**36.** *Financeamerica Private Brands, Inc. v. Harvey E. Hall, Inc.*, Del.Super., 380 A.2d 1377, 1379 (1977).

**37.** The inclusion of guarantee and assume as acts that may be subject to the supermajority provision precludes any reading of "borrowed money" as the equivalent of "money borrowed by Explorer" because both involve primary or initial borrowing by a third party.

**38.** Black's Law Dictionary 366 (6th Ed.1990). "Create" is not defined in its Seventh Edition.

action documents. Without Explorer's efforts and without the commitment of Explorer's credit to the transaction, there would be no transaction and no operating lease. The issue, thus, becomes whether these critical and initiating acts of Explorer constitute the "creation" of indebtedness for borrowed money.[39]

I conclude that it would be unreasonable to interpret "create indebtedness for borrowed money" in these circumstances to include Explorer's role in the development and implementation of the operating lease transaction. First, it is easy to envision numerous transactions where Explorer could provide the impetus for a third party to borrow money. For example, the landlord of an Explorer office might be induced to expand the office building, or a supplier might borrow to be able to produce the material to be purchased by Explorer. Without Explorer, there would have been, in these examples, no borrowing, but Explorer cannot be said to have "created" the debt even though the debt would not have come into existence without Explorer's involvement. That Explorer may have been even more deeply involved in structuring the transaction in this instance than in the examples does not alter the validity of the basic analysis.

Second, the indebtedness for borrowed money in the proposed transaction is created (i.e., brought into existence) by the acts of the lender and the Trust, as borrower. Although Explorer may be a participant in the larger transaction, it is not a party to those very acts that create or establish the indebtedness for borrowed money.

Third, the string of other initiating verbs—incur, assume, and guarantee—is consistent with the reading of the supermajority provision to the effect that the focus of the supermajority provision is on Explorer's becoming liable for indebtedness for borrowed money, regardless of when or by whom the money is borrowed, without there first having been the requisite supermajority approval. To interpret "create" in this context to apply to a third party's borrowing of money—money the repayment of which is not Explorer's own obligation—would give a meaning that is not consistent with the rest of the clause in which it appears.

■ Thus, the indebtedness of the Trust for borrowed money was not "created" by Explorer through its actions to initiate and facilitate the operating lease transaction, or otherwise.[40]

---

**39.** Opposition Respondents essentially argue that by originating the concept of implementing the mainline expansion through an operating lease, by bringing the transaction participants together (or facilitating it), and by providing the credit, Explorer can be deemed the "creator" of the project as a whole, including the selected method of financing. If Explorer "creates" the project, including the financing mechanism, then it is argued that Explorer "creates" each of the components of the project and, of course, one of the components is the borrowing of money by the Trust. That interpretation, in the Court's judgment, is not the interpretation of the supermajority provision that would be ascribed by an objective and reasonable third party reader of the certificate of incorporation. *See Wolfson v. Supermarkets General Holdings Corp.*, Del.Ch.,

C.A. No. 17047, mem.op. at 7–8, Jacobs, V.C., 2001 WL 85679 (Jan. 23, 2001).

**40.** CITGO has argued separately that the supermajority provision is ambiguous and that its ambiguity is demonstrated by Explorer's resort to accounting standards and to tax principles in order to interpret it. I do not find the supermajority provision, either when read alone or when read in the context of the balance of Explorer's certificate of incorporation, to be ambiguous. Explorer's references to the accounting and tax standards are primarily necessitated by the board's resolution authorizing the operating lease format and conditioning approval upon these standards. If the supermajority provision were ambiguous, that would create a different problem for the Opposition Respon-

The Opposition Respondents also argue that the language of "incur, create, assume or guarantee" should be read broadly. The Court acknowledges that focusing precisely on the meaning of each word in a series carries with it the risk that the intent of the provision will be construed too narrowly. Thus, a comprehensive consideration is also necessary. Even if the language is construed broadly, it cannot be read to go beyond a concern about the imposition on Explorer or the acceptance by Explorer of liability, regardless of whether it results from direct obligation, guarantee, or otherwise, for indebtedness for borrowed money. Three words—"for borrowed money"—in the end defeat Opposition Respondents' argument. In construing a supermajority provision in a certificate of incorporation, which, for the reasons set forth above, cannot be "extended by liberal interpretation," [41] the Court cannot overlook the truism that Explorer, in the proposed transaction, will not be liable for borrowed money.

■ Accordingly, I conclude that operating lease format, as generally proposed here, does not result in Explorer's incurring, creating, assuming, or guaranteeing any indebtedness for borrowed money.[42]

dents because "[w]hen a provision which seeks to require the approval of a supermajority is unclear or ambiguous, the fundamental principle of majority rule will be held to apply." *Centaur Partners, IV v. National Intergroup, Inc.*, 582 A.2d at 927. Further, CITGO asserts that there is no basis to distinguish between capital lease transactions, which Explorer concedes are subject to the supermajority provision, and operating lease transactions, such as the one at issue here. This contention confirms that each transaction must be evaluated on its own merit. Indeed, Opposition Respondents concede that some operating leases would not be subject to the supermajority provision. (Opposition Respondents' Answering Brief at 33).

■ Opposition Respondents next argue that the supermajority provision's limitation on indebtedness in excess of $15 million applies to the proposed transaction. They focus on the following language:

[The Board may incur . . . indebtedness for borrowed money . . .] provided the outstanding balance of indebtedness approved by the Board of Directors does not exceed fifteen million dollars ($15,-000,000) and in the event the Board approved outstanding indebtedness equals fifteen million dollars ($15,000,-000), then no further indebtedness . . . shall be incurred, created, assumed or guaranteed by the Corporation unless [a supermajority vote is obtained].

If the operating lease transaction exceeds $15 million, as it does, and if, as set forth above, the obligations imposed through the operating lease constitute indebtedness, then, so the Opposition Respondents' argument goes, supermajority approval is necessary, particularly because the proviso literally applies to "indebtedness" and not to "indebtedness for borrowed money." This raises two related questions. One is whether the "indebtedness" of the proviso is limited by reference to the "indebtedness for borrowed money" appearing at the beginning of the supermajority provision, *i.e.*, should "indebtedness" in the pro-

**41.** *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d at 1155.

**42.** This construction of the supermajority provision suggests that it can be circumvented through careful use of the operating lease device. An interpretation that renders a contractual provision meaningless is, of course, not favored. However, this interpretation does not render the supermajority provision meaningless because it still applies with full force to control that which it was drafted to control: indebtedness for borrowed money, without the need for any inquiry into whether the debt was short-term or long-term commercial paper.

viso be read restrictively as "indebtedness for borrowed money"? The second is whether the proviso is applicable to the proposed transaction if it is determined that the proposed transaction does not constitute the incurrence, creation, assumption, or guarantee of any indebtedness for borrowed money?

■ The supermajority provision authorizes the board, with a three-fourths vote, to "incur, create, assume or guarantee" indebtedness for borrowed money. The latter references to indebtedness not exceeding $15 million follow the word "provided." A proviso, as introduced here by the word "provided," acts as a limitation on the language that describes the scope of the provision and is read in reference to the specific scope of the language defining the provision's application. The limiting language (not to exceed $15 million) refers to indebtedness approved by the board that is subject to Article EIGHTH, paragraph (d). It cannot be expanded to apply to any obligation specifically-addressed in Article EIGHTH, paragraph (d). More specifically, the proviso is a limitation of a grant of authority (*i.e.,* "incur . . . indebtedness for borrowed money") to the board that Explorer is not relying upon. Article EIGHTH, paragraph (d) authorizes the board to incur, create, assume and guarantee indebtedness for borrowed money and thus, under certain circumstances, imposes limitations on that authority. The limitations are not an independent limitation on the power or discretion of the board. If indebtedness for borrowed money is not involved, then this proviso simply does not apply.

Thus, the supermajority provision is not ambiguous, and the Court has construed, without resort to extrinsic evidence, Article EIGHTH, paragraph (d) in a context framed by the Term Sheet and the progression of negotiations for the operating lease arrangement. This provision does not require supermajority shareholder approval for the operating lease transaction approved in concept by the board and evidenced by the draft operating lease and related transactional documents as generally described by the parties.

It is important, however, to recognize that this judicial review is limited in scope. Specifically, the Court has not determined if the transaction documents (at whatever stage of completion) (a) comply with accounting, tax, and UCC requirements for operating leases; [43] (b) comply with the board's authorizing resolution; or (c) contain specific provisions that would convert the proposed operating lease transaction into one that would require supermajority approval.[44] The draft documents cited by the parties have amplified the board's resolution authorizing the transaction and have provided a context for both an interpretation of Article EIGHTH, paragraph (d) and for evaluating the economic reality contentions advanced by Opposition Respondents.

Because there are no material facts in dispute and because Explorer, as a matter of law, is entitled to construction of the supermajority provision to the effect that it is not applicable to the proposed operating lease transaction, Explorer is entitled to partial summary judgment on this issue.[45]

---

43. *See* Affidavit of Robert E. Verrecchia, ¶ 15.

44. An example of such a specific provision (which, in this instance, might also jeopardize compliance with other conditions) would be a *specific guarantee* of the Trust's borrowing, whether in the construction agency agree-

ment, the operating lease, or any of the other documents to be executed by Explorer.

45. The Opposition Respondents highlight what they consider to be three disputed issues of material fact that preclude summary judgment. (Opposition Respondents' Answering Brief, p. 20):

### E. Extrinsic Evidence.

When the construction of a contract, in this case the certificate of incorporation, can be accomplished without resort to extrinsic evidence, a brief review of the extrinsic evidence presented to the Court, nevertheless, may lend comfort to the conclusions drawn. In this instance, the extrinsic evidence is less than conclusive.[46]

Opposition Respondents' most persuasive argument is that an operating lease and traditional bank borrowing (in the words of the certificate: "borrowed money") have substantially the same economic impact on the company.[47] Large payments over a long term must be made. Cash flow and the potential for other projects will be affected. Serious consequences will result if the payments are not made or if the project is not successful. Credit agencies will treat the operating lease as the substantial equivalent of long-term debt. Thus, Opposition Respondents argue, their rights afforded by the super-majority provision, the protection of the minority shareholders against Explorer's incurring cumulative debt obligations in excess of $15 million, are implicated. As a matter of consistent corporate governance policy, the Opposition Respondents' argument makes sense. However, to achieve the result that they advance, the certificate of incorporation would not require mere interpretation, it would require reformation.[48]

Article EIGHTH, paragraph (d) was amended in 1990. The amendment, the minutes of the meetings at which the amendment was considered, and the comments or recollection of some of the individuals involved with the amendment about the events leading up to it shed some light on the meaning of the provision. Before its amendment, the provision read in pertinent part, as follows:

> EIGHTH. In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized by the affirmative vote of three-fourths of the whole Board:
>
> * * *
>
> (d) To incur, create, assume or guarantee any indebtedness for borrowed money, including the execution or creation of mortgages and liens in connection therewith upon the real and personal property of the Corporation; *provided that no indebtedness due more than twelve months from the date of creation* and no mortgage or lien in connection therewith, shall be incurred, created, assumed

---

1. Whether the transaction qualifies as an "operating lease" under applicable accounting and tax rules. The Court does not reach this issue.

2. Whether the transaction is in economic substance "indebtedness." The Court's analysis accepts Opposition Respondents' position on this issue.

3. Whether Explorer's role in "creating" the transaction triggered the supermajority provision. The "facts" as to Explorer's role are not in dispute, and the Court accepts Opposition Respondents' factual analysis of Explorer's role. However, the Court concludes that such conduct does not constitute "creating indebtedness for borrowed money" within the plain meaning of the supermajority provision.

**46.** The following discussion of the extrinsic evidence is not intended to be comprehensive. Also, the Court has not addressed the relative weight (or even admissibility) of the extrinsic evidence recited by the parties.

**47.** Opposition Respondents point out that the cost of an operating lease arrangement will exceed the cost of a traditional debt financing.

**48.** The economic substance argument carries the Opposition Respondents only so far. If, in the perhaps unlikely event that the Trust were funded by equity contributions alone and not with any "borrowed money," what would be the basis for challenging such a transaction even though Explorer's obligations to the Trust would be identical to those of the proposed transaction?

or guaranteed by the Corporation unless authorized by the affirmative vote of the holders of at least seventy-five per cent of the stock issued and outstanding having voting power.... [49]

Thus, before the 1990 amendment, the limiting factor was not the amount of indebtedness, but the term or duration of the debt. Short-term (less than one year) commercial paper did not require shareholders' supermajority approval; longer-term debt did.

The 1990 amendment was the result of a controversy that arose in 1988. Explorer was then considering a $19 million capital project to be funded with short-term debt. Because the debt would not be repaid within the year, it was obvious that the debt would be "rolled over." Some shareholders took the view that, once the short-term debt was incurred, they would have no option but to keep issuing short-term debt or to agree to convert it to a mix of medium and longer-term debt. Counsel for one of the shareholders objected as follows:

> Our point is, a major project costing in excess of $19 million should not be decided in that manner merely because it *can* be done that way.
>
> * * *
>
> The key language in our view, in the commercial paper policy is "*short-term* financing of a approved capital projects". We do not consider this a short term project. Should the markets turn around next year (as Shell thinks they may), a vote of 75% of the stock would be required to enter into a long term

financing. But the decision would have been taken away from the stockholders, because the money will have been spent on the vote of a majority of a quorum of the Board.

Our concern is whether the *spirit* and *intent* of the funding policy is being followed and, also, very plainly, whether the decision to spend $19 + million on a major capital project *should* be approved in the manner suggested.[50]

The writer of that objection now states that her clients' (a predecessor to Equilon) position "pertains specifically to the borrowing of money and not to any other method of funding a project." [51] Such after-the-fact (here by more than a decade) interpretations are of limited value.[52] Explorer's counsel and legal representatives of the shareholders discussed revisions to the troublesome language and eventually the shareholders agreed to the amendment. The minutes of the directors' meeting where the changes were approved are instructive:

> The purpose of the suggestive course of action is to resolve the issue of whether Article EIGHTH, paragraph (d) of the Certificate of Incorporation required Board approval or Stockholder approval for the issuance of commercial paper where the commercial paper is "rolled over" beyond a year or where the possibility exists that it may be refinanced with long-term debt at a later date.[53]

Thus, one can read these minutes and conclude that the purpose of the amendment to the supermajority provision was to

**49.** Affidavit of Peter J. Luitwieler, Ex. A. ("Luitwieler Aff.") (emphasis added).

**50.** Letter of Barbara C. Hickl to Curtis L. Craig, dated October 7, 1988, Affidavit of Paul M. Lukoff, Ex. 1–A (emphasis in the original).

**51.** Affidavit of Barbara C. Hickl, attached as Ex. 1 to the Affidavit of Paul M. Lukoff.

**52.** *See Star Cellular Telephone Co., Inc. v. Baton Rouge CGSA, Inc.,* Del.Ch., C.A. No. 12507, mem.op., Jacobs, V.C., 1993 WL 294847 (Aug. 2, 1993).

**53.** Craig Aff., ¶ 22 (reciting that a similar statement can be found in the minutes of the shareholders' meeting that approved the amendment).

address borrowing in the traditional sense through the use of commercial paper.

According to one participant in the 1990 amendment process:

To the best of my knowledge, during the several months of discussions pertaining to the amendment to Paragraph (d), no Director or Stockholder (and no legal or financial representative of any Director or Stockholder) ever expressed the view, in words or writing, that the amendment was intended to, or would have the effect of, changing the meaning and scope of the terms "indebtedness for borrowed money" and "indebtedness" as they were used in Paragraph (d) before its 1990 amendment. To the best of my knowledge, during the several months of discussions and negotiations pertaining to the amendment to Paragraph (d), no Director or Stockholder (and no legal or financial representative or any Director or Stockholder) ever expressed the view, in words or writing, that Paragraph (d), either before or after implementation of the 1990 amendment, was intended to apply to operating leases.[54]

Another participant has a different recollection:

The result of the amendment was that whatever the form of the transaction, major capital projects must secure the approval of at least 75% of the shareholders.... These modifications to Paragraph (d) are consistent with and recognize the joint venture character of Explorer.[55]

Yet even this participant concedes that "the use of operating leases as a means of financing capital projects [by Explorer] was never even contemplated.[56]

These two affidavits are consistent to the extent that they concur that operating leases were not even considered at the time.[57] Because a supermajority provision restricts the general right of the majority to govern corporate activities, that operating leases were not even considered may tend to support the conclusion that the supermajority provision was not intended to address or to restrict the use of operating leases.[58]

Finally, it has been noted that operating leases had not been used for pipeline expansions.[59] However, operating leases had been around (as of 1990) for many years as a means for funding capital improvements.

In sum, the extrinsic evidence, had it been necessary to turn to it, would not have been conclusive, at least on the present record, but it would have tended to support the interpretation advanced by Explorer, i.e., that the supermajority provision should not be construed to restrict the use of operating leases as now contemplated by Explorer.

▆ Delaware follows the "well-established, general principle that (absent

---

54. Craig Aff., ¶ 24.

55. Luitwieler Aff., ¶ 9.

56. *Id.*, ¶ 8.

57. One cannot conclude from the record whether there was a general understanding that all major capital expenditures would be subject to supermajority approval. If there was such an understanding, it likely was an understanding borne of a failure to consider options other than debt "for borrowed money".

58. One contemporaneous document (appearing as Luitwieler Aff., Ex. C) recites, "The proposed revision will allow the Board to borrow up to an aggregate amount certain, which will be determined by the Stockholders, regardless of the debt instrument, debt term and reduction of long-term debt." Because the text preceding the quoted language addresses commercial paper policy, it is difficult to expand the meaning of "debt instrument" to include operating leases, at least on this record.

59. Luitwieler Aff., ¶ 10.

grounds for reformation which are not present here), it is not the proper role of a court to rewrite or supply omitted provisions to a written agreement." [60] The Court can conclude, nevertheless, that Explorer's rental obligations under the operating lease format constitute indebtedness within the meaning of the supermajority provision because "[i]n cases where obligations can be understood from the text of a written agreement but have nevertheless been omitted in the literal sense, a court's inquiry should focus on 'what the parties likely would have done if they had considered the issue involved'." [61] The rental payment obligations may not strictly be "indebtedness," but that those obligations are within the scope of the drafters' intent, as evidenced by the plain meaning of the word chosen and in the context in which such word was used, is clear. The drafters of the 1990 amendment, who were addressing an issue raised by questions about a commercial paper policy in the context of approval of expenditures for major capital improvements, chose to leave the phrase "for borrowed money" as they found it. While the Court is able to construe "indebtedness" as encompassing Explorer's lease payment obligations, it cannot rewrite the provision to read, in substance, "to incur, create, assume, or guarantee any indebtedness for borrowed money, operating lease payments or otherwise." The scope of the supermajority provision is limited by the term "for borrowed money," and the Court must accept the words chosen by the drafters. Perhaps a provision that restricts not only "borrowed money" but also operating

lease payments would be appropriate for Explorer, particularly because of the nature of its venture and its venturers. However, it is not the function of the Court, on this record, to substitute its views for the language drafted on behalf of and approved by sophisticated and informed shareholders more than an decade ago.

### F. Other Issues.

The Opposition Respondents have raised issues not directly involving construction of the supermajority provision as grounds for demonstrating that Explorer is not entitled to the relief that it seeks. These issues (some of which have been articulated with greater particularity than others) include: the doctrine of equitable constraint said to be applicable to Explorer's conduct or the majority shareholders' conduct; the improper election of a director; the unreasonableness of employing an operating lease (with its significantly higher costs) simply to avoid the supermajority provision; abuse of voting rights; failure to provide essential information, including information about ..... **confidential** .............., to the board; conflicts of interest among members of Explorer's board; unclean hands; and breach of implied covenants of good faith. [62] In this Memorandum Opinion, the Court has addressed a legal issue involving the construction of a provision in a certificate of incorporation and has determined that a board resolution may be implemented in the face of potentially prohibiting charter language. The remainder of the issues are generally equitable in nature and are di-

60. *Cincinnati SMSA, L.P. v. Cincinnati Bell Cellular Systems Co.*, 708 A.2d at 992.

61. *Id.*, quoting *DuPont v. Pressman*, Del. Supr., 679 A.2d 436, 443 (1996).

62. The Court, of course, expresses no view as to the merits or timing of these contentions.

The Court acknowledges that some of the facts on which these claims are premised have been omitted because they are not germane to the narrow issue decided and they are better developed in a context where they may be material.

rected to whether even a "legal" transaction should be allowed to proceed. This is a question that may be framed by the Opposition Respondents' pending application for interim injunctive relief (to the extent that the application goes or will go beyond construction of Article EIGHTH, paragraph (d) of the charter), and the Court considers that application as providing an appropriate procedural context for assessment of these claims. Furthermore, the Court is not, at least at this stage and without further argument from the parties who properly have been more attentive to the question of construction of the supermajority provision, persuaded that these "equitable" issues do not involve some material factual disputes.

## V. CONCLUSION

Accordingly, Explorer, subject to those limitations set forth above, is entitled to the partial summary judgment that the operating lease format, approved by its board and as generally amplified by the negotiated-drafts of the transactional documents, is not subject to the supermajority shareholder approval requirements of Article EIGHTH, paragraph (d) of its certificate of incorporation.

I ask that counsel confer upon a form of order to implement this decision.