**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| KORY DYER and SUMER LYNN DYER, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | C.A. No. 2020-0062-NAC |
| | ) | |
| JANINA M. SERVINO and JAMES J. SERVINO, III, | ) | |
| | ) | |
| | ) | |
| Respondents. | ) | |

**POST-TRIAL MEMORANDUM OPINION**

Date Submitted: April 3, 2025
Date Decided: November 5, 2025

Donald L. Gouge, Jr., DONALD L. GOUGE, JR., LLC, Wilmington, Delaware; *Counsel for Petitioners Kory Dyer and Sumer Lynn Dyer.*

Seth A. Niederman, Nathan D. Barillo, FOX ROTHSCHILD LLP, Wilmington, Delaware; *Counsel for Respondents Janina M. Servino and James J. Servino, III.*

**COOK, V.C.**

This post-trial opinion addresses the use by Petitioners Kory and Sumer Dyer of a paved driveway located in Upham Downs Farms, a residential subdivision in Middletown, Delaware. After a two-day trial, I find that the Dyers have shown, by clear and convincing evidence, entitlement to an easement over the paved driveway. The Dyers' request for a permanent injunction will be granted. My reasoning is set forth below.

## I.     FACTUAL BACKGROUND

The following facts are drawn from the trial record, which includes twenty stipulations of fact, twenty exhibits, and live testimony from nine witnesses.[1] Having evaluated the evidence, the Court makes the following findings.

### A. The Creation of Upham Downs Farms And Delmarva Power's Rejection Of The Originally Proposed Driveway Location

In the 1980s, Richard W. Keith Jr. acquired several acres in Middletown, Delaware at an auction sale.[2] The land connects to Port Penn Road, formerly known as Biddles Corner Road.[3] Keith determined to subdivide the property into lots that he would then sell.[4]

Keith engaged a land surveyor to prepare a plan for the property. The surveyor provided Keith a plan, dated September 22, 1988, for a six-lot subdivision.[5] Lots 1

---

[1] Citations to Pre-Trial Stip. refer to the Joint Pre-Trial Stipulation and Order. Dkt. 207. Joint trial exhibits are cited as "JX ___," and trial testimony is cited as "TT ___ ([Name])."

[2] TT 155:9–15 (Keith).

[3] Pre-Trial Stip. ¶ 3. The deed, survey and recorded plan documents variously refer to "Biddle's Corner Road," "Biddles Corner Road," and even "Biddles Church Road."

[4] TT 156:16–18 (Keith).

[5] TT 156:18–23 (Keith); Pre-Trial Stip. ¶ 2.

and 2 would directly access Port Penn Road.[6]   Lots 3, 4, 5 and 6, which were set behind Lots 1 and 2, would be carved out as "flag lots," with the flag-pole portions touching Port Penn Road.[7]  The flag portion of Lot 6 would be farthest from Port Penn Road, while the flag portion of Lot 3 would be immediately behind Lots 1 and 2.[8]

Delmarva Power ("Delmarva") possesses a 150-foot-wide right of way running parallel and alongside the flagpole portion of Lot 4, such that the flagpole portions of Lots 5 and 6 are within the Delmarva right of way.[9]  Delmarva power lines run the length of Delmarva's right of way.[10]  In preparing the initial subdivision plan, Keith believed it would be cost-effective to build the common driveway for Lots 4, 5 and 6 within Delmarva's right of way.[11]  The surveyor's September 22, 1988 subdivision plan therefore reflected a proposed common driveway within the right of way.  Given this, Keith shared a copy of the plan with Delmarva and suggested that the driveway could also serve as a maintenance road for Delmarva.[12]

---

[6] Pre-Trial Stip. ¶ 3.

[7] *Id.* ¶ 4.  Those lots are called "flag lots," because the "flagpole" portions would each touch Port Penn Road.  *Id.*

[8] *Id.*

[9] TT 158:2–5 (Keith); *see* JX 3.  Correspondingly, not insignificant segments of the flag portions of Lots 5 and 6 fall within the Delmarva right of way.

[10] TT 158:2–3 (Keith).

[11] TT 159:17–21 (Keith) ("So if I understand, your answer is that it would have been much cheaper and easier for you if you could have put the road in within their 150-foot-wide easement? A. Yes.").

[12] TT 160:13–15 (Keith).

Delmarva sent a letter, dated April 27, 1989, to Keith in response.[13]  The letter observed that Keith's proposed driveway improperly ran "parallel in and to [its] 150 foot wide right of way."[14]  Delmarva thus informed Keith that it would "not allow" him to build the driveway in the location proposed "because in the event Delmarva Power would want to add additional facilities in the right of way [the] proposed driveway would effectively reduce the 150 foot width of the right of way."[15]  The Delmarva letter concluded by asking that Keith "locate driveways for the proposed subdivision outside the right of way" and reference Delmarva's right of way in the subdivision plan and deeds.[16]

On May 17, 1989, following the Delmarva letter, Keith submitted a revised subdivision plan to New Castle County ("Record Plan").[17]  The Record Plan maps Delmarva's 150-foot-wide right of way and includes a note indicating its record location.[18]  In this revised Record Plan, however, there is now a 20-foot-wide

---

[13] JX 4 ("I have reviewed the Record Minor Subdivision Plan[,] dated September 22, 1988 . . . which divides your land on Biddle's Corner Road . . . into six lots.").

[14] *Id.*

[15] *Id.*  The letter continued, "Delmarva Power must maintain the entire 150 foot wide right of way and not restrict its full width in order to provide for possible future electric needs." *Id.*

[16] *Id.*

[17] JX 3.

[18] *Id.* ("Subject to a 150 wide right of way of record in the Office of the Recorder of Deeds in New Castle County, Delaware and recorded in Deed Record N, Volume 79, Page 225, which restricts the erection of any structure within the limits of the right of way, and restricts the land being used by the owner for any purpose which would interfere with Delmarva Power's use of the right of way.").  Notably, this text matches the text that Delmarva asked, in its April 27 letter from three weeks prior, Keith to include in the subdivision plan going-forward. JX 4 ("Delmarva Power respectfully requests that you . . . add an additional 'Note'

3

easement alongside—and just outside of—Delmarva's 150-foot-wide right of way ("Drafted Driveway Easement").[19] This is consistent with the modification requested by Delmarva in its April 27 letter. And indeed, the bottom right corner of the plan reflects a notations box titled "Revisions," which in turn includes the following notation: "4-27-89 Relocated Common Driveway." [20] This date coincides with Delmarva's April 27 letter rejecting the previously proposed location of the driveway and asking that it be located outside the Delmarva right of way.

Vis-à-vis the lots, the easement is shown on the Record Plan as running along the east-southeasterly flagpole and flag portions Lot 4, then straight across the flag portion of Lot 5 to Lot 6. To aid the reader, a picture (albeit fuzzy) follows:[21]

---

to your Record Minor Subdivision Plan for Upham Downs Farms that would appear as follows: . . . .").

[19] Pre-Trial Stip. ¶ 7; JX 3. The Record Plan refers to Delmarva's 150-foot-wide right of way as the "150' wide Delmarva Power and Light Company Easement." *Id.* For purposes of this decision, I use the term right of way since that is how Delmarva described it and to avoid confusion with the numerous other easement references.

[20] JX 3.

[21] *Id.*



Both the land surveyor and Keith certified the accuracy of the Record Plan.[22] The Record Plan was recorded in the Office of the Recorder of Deeds in and for New Castle County as Microfilm No. 9818.[23]

---

[22] *Id.*

[23] *Id.*; Pre-Trial Stip. ¶ 11.

## B. Keith Constructs The Present Driveway Around The Time Of His Sale Of Lot 6

In the fall of 1989, Keith sold Lot 6 to Merritt and Elizabeth Wallick and, around the time of the sale, constructed a driveway connecting the flag lots of Upham Downs Farms ("Present Driveway").[24] Keith's intent on building the Present Driveway was for the Wallicks to access their newly purchased lot and construct their home.[25] Keith still owned Lots 3, 4, and 5 and thus owned the property over which the Wallicks would drive over to build and move into their new home.

Thus, at some point around the time of the sale of Lot 6, Keith hired an excavation company to plan and build the driveway.[26] The excavation company and Keith considered factors of aesthetics, cost, and perceived health concerns in determining where to place the driveway. The general area in which Delmarva's power lines were located was cleared of trees. The tree line curved into a segment of the Lot 5 flagpole and then back, more or less in a line with the remainer of the Drafted Driveway Easement. Placing the driveway more inside that tree line would, however, present a more aesthetically pleasing view of the tree canopy to homeowners—and potential lot buyers—than Delmarva's powerlines.[27] In addition, placing the driveway well inside the tree line would require the removal of fewer trees,

---

[24] TT 162:17-24 (Keith) ("Q. Do you recall -- this says 'Existing Drive.' Do you recall if this was installed before or after you sold Lot 6 in October of 1989? A. Back around the same time. It was most likely before. But around the same time because to get back there -- we had to, you know, put a road before we could even access it for them to build the house."); Pre-Trial Stip. ¶ 12; JX 13.

[25] TT 162:20–24 (Keith).

[26] TT 161:20–162:2 (Keith).

[27] TT 165:19–21 (Keith).

which in turn would be more cost effective.[28]  And, beyond simple aesthetics, Keith testified that placing the driveway within the tree canopy would provide a "buffer" from the power lines, which would presumably mitigate individuals' reluctance to purchase lots near power lines at that time due to perceived health concerns.[29]

Keith accordingly constructed an unpaved, crush-and-run driveway[30] in the location of the Present Driveway.[31]  As has been foreshadowed, however, the Present Driveway was not placed within the Drafted Driveway Easement; it is instead located approximately thirty feet west-northwest of the Drafted Driveway Easement.[32]  It

---

[28] TT 161:20–162:2 (Keith).

[29] TT 165:21–166:1 (Keith) ("And back then, . . . there was always uproar about power lines having adverse effects to health and all that with electric magnetic fields.  So we brought it in[side the tree line] to try to get that buffer between us and the power lines.").

[30] TT 179:16–180:10 (Keith).

[31] Keith testified that he did not put the driveway in the Drafted Driveway Easement because he believed Delmarva's letter rejected placing the driveway alongside its 150 foot right of way.  As a result, Keith moved the driveway further inside the tree line to the location of the Present Driveway.  TT 171:18–172:7 (Keith) ("Q. You testified that you believed that there was some sort of buffer that was required, and you indicated that Delmarva had told you that.  Do you recall that testimony? A. I was trying to think that they were -- they didn't want me to run alongside their easement, like right parallel to it.  Just so I didn't encroach into their easement.  So they made a point to tell me do not encroach on their easement because it would cause a problem in the future.  So I just stayed well within [*i.e.*, outside] their easement because I didn't really want to deal with having a problem with Delmarva later on.").  Keith's testimony that Delmarva rejected a proposal to place a driveway alongside Delmarva's right of way is inconsistent with the contemporaneous documents and my findings.  That said, I found Keith a generally credible witness who was doing his best to recollect events that occurred over three decades ago.  Having considered the complete evidentiary record, I frankly do not fault him for confusion in trying to reconstruct the chronology of the late-1980's Record Plan and his understanding of and actions in response to the 1989 Delmarva letter.  And unfortunately, the September 1988 pre-revision version of the Record Plan, which Keith provided to Delmarva and which reflected Keith's originally proposed location for the driveway, does not appear in the record.  *See, e.g.*, TT 276:3–20 (Davies).  I presume it is lost to the sands of time.

[32] Ex. B to James F. Harker Expert Report ¶ 12, Dkt. 203.

7

begins at Port Penn Road and runs, roughly parallel to and inside the historical tree line, in a slightly curving fashion along the flagpole portion of Lot 4, onto the corner of the flag portion of Lot 3, and then across the easterly sides of the flag portions of Lots 4 and 5, terminating on Lot 6.[33]

Notably, Keith caused other plan documents to be prepared showing the Present Driveway, but Keith did not record any of these plans or a further revised version of the Record Plan.[34]  For example, in 1991, Keith submitted a survey of Upham Downs Farms to the Delaware Department of Transportation to obtain an entrance permit to the subdivision ("1991 DelDOT Plan").[35]  The 1991 DelDOT Plan shows the Present Driveway.  But Keith did not record this plan.[36]

## C. Keith Sells Lot 5 And The Owners Of Lots 4, 5, and 6 Contemporaneously Enter Into The 1992 Agreement

After obtaining the 1991 DelDOT Plan, Keith sold Lot 5 to Melvin and Joanne Melancon on June 16, 1992 ("1992 Deed for Lot 5").[37]  In conjunction with the sale of Lot 5 to the Melancons, Keith instructed his attorneys to draft the 1992 Agreement for the construction and maintenance of, and grant of an easement over, a

---

[33] Pre-Trial Stip. ¶ 9; JX 16.  In contrast, the Drafted Driveway Easement runs straight along the entire eastern length of the flagpole and flag portions of Lot 4, across the easterly side of the flag portion of Lot 5, and onto Lot 6.

[34] *See e.g.*, JX 16.

[35] JX 7; TT 25:1–4 (Harker).  The entrance permit was necessary because certain improvements were required to cut the Present Driveway into a public road like Port Penn Road.  TT 55:1–8 (Harker).

[36] Pre-Trial Stip. ¶ 14.

[37] Pre-Trial Stip. ¶ 13; JX 8.

8

contemplated paved common driveway.[38]  Accordingly, Keith as the owner of Lot 4,

entered into a contemporaneous agreement with the Melancons and Wallicks, as the

owners of Lots 5 and 6, respectively, to create and maintain the "common driveway"

("1992 Agreement").[39]

The 1992 Agreement provides that a "driveway shall be constructed and

maintained" with "material base, surface coating and asphalt topping."[40]  It includes

numerous provisions governing the driveway, including provisions for the sharing of

construction and maintenance costs among the owners of Lots 4, 5 and 6; vehicle

weight limits and usage restrictions; lot-owner voting rights; and contractual fee-

shifting.[41]

The 1992 Agreement further expressly provides for an easement for the

intended paved driveway and provides that "this grant of easement shall be perpetual

and shall run with the land and shall be binding on and shall inure to the benefit of

the Owners[42] hereto, their and each of their heirs, successors or assigns."[43]

---

[38] TT 164:18–166:12 (Keith).

[39] Pre-Trial Stip. ¶ 15; JX 20.  The 1992 Agreement is dated June 19, 1992, and was executed among the lot owners between June 16 and June 19.  The 1992 Agreement is thus contemporaneous with the 1992 Deed for Lot 5.

[40] JX 20 ¶ 4.

[41] *E.g., id.* ¶¶ 3, 5, 7.

[42] "Owners" is defined as "each of the present and future owners of Lots 4, 5 and 6[.]" *Id.*, Recitals.  At the time the 1992 Agreement was signed, Keith owned Lot 4; the Melancons owned Lot 5; and the Wallicks owned Lot 6.  Each signed the agreement.

[43] *Id.* ¶ 13; *accord id.* ("WHEREAS, the parties to this agreement desire to create a common driveway for the benefit of each of the present and future owners of Lots 4, 5 and 6").

9

The 1992 Agreement does not, however, unambiguously specify the location of the intended paved common driveway and its easement. Instead, the 1992 Agreement provides that:

An easement for "Common Driveway Purposes" as set out in the shaded portion of the [Record] Plan and designated as a 20 foot wide easement for egress and ingress of Lots 4, 5 and 6 is created over the strip of land 20 feet in width so designated in favor of Lot Nots. 4, 5 and 6 as said easement is more particularly bounded and described as set out in Exhibit A hereto which is by reference made a part hereof.[44]

The references to "the shaded portion of the [Record] Plan" and a "20 foot wide easement for egress and ingress of Lots 4, 5 and 6" point to the Drafted Driveway Easement.[45] If the text stopped there, that would be one thing. But the text does not. Instead, the passage provides that the easement granted by the 1992 Agreement "is more particularly bounded and described as set out in Exhibit A hereto which is by reference made a part hereof." In turn, Exhibit A to the 1992 Agreement identifies specific metes and bounds that track the location of the Present Driveway—but only as it exists over Lot 5.[46]

---

[44] *Id.* ¶ 1. The 1992 Agreement does not define "Common Driveway Purposes[.]" Instead, the agreement provides that "'Driveway [P]urposes' as used in this agreement means ingress and egress by foot and by vehicle . . . ." *Id.* ¶ 3. The agreement further provides that "[t]his easement and direct access is superior and paramount to the rights of any of the Owners in the respective servient estates as created by this easement." *Id.* ¶ 2.

[45] The phrase "20 foot wide easement for egress and ingress of Lots 4, 5 and 6" matches the description of the Drafted Driveway Easement shown on the Record Plan. *See* JX 3.

[46] JX 20, Ex. A ("[T]hence from the point of Beginning, along lines of Lot 5, South 35° 40' 37" West, 205.21 feet to a point in Lot 6; thence by the same, North 56° 55' 33" West, 25.04 feet to a point in line of Lot 5; thence by the same, North 35° 40' 37" East, 205.21 feet to a point in line of Lot 4; thence by the same, South 56° 55' 33" East, 25.04 to the first mentioned point or place of Beginning."); TT 215:18–23 (Davies).

10

The contemporaneous 1992 Deed for Lot 5 contains similarly ambiguous text. Via the 1992 Deed for Lot 5, Keith conveyed all land for Lot 5 "as shown on the [Record Plan]."[47] The deed further provides that it is "subject to a 20.00 feet wide easement for egress and ingress of Lots 4, 5 and 6, dated the 16th day of June 1992 . . . ."[48] As with the 1992 Agreement, the deed's references to the Record Plan and to a "20.00 feet wide easement for egress and ingress of Lots 4, 5 and 6" would seem to point to the Drafted Driveway Easement. But the text does not stop there. The deed's reference to an easement "dated the 16th day of June 1992[,]" points to the contemporaneously executed 1992 Agreement.[49] And, similar to the 1992 Agreement, the general description of the easement in the 1992 Deed for Lot 5 is immediately followed with the phrase "said easement is particularly bounded and described as follows[,]" with the specific metes and bounds tracking the location of the Present Driveway as it exists over Lot 5.[50]

---

[47] Pre-Trial Stip. ¶ 13; JX 8.

[48] JX 8.

[49] JX 20 (providing, on the signature page, that "the Owners have executed this agreement on June 16 and June 19, 1992"). The passage immediately following the deed text quoted above provides that the easement is recorded and includes blanks for where it can be found. JX 8 (providing that the easement is "recorded in the Office of the Recorder of Deeds in and for New Castle County in Deed Book __, Page __ [sic]). Although the blanks are not filled in, the 1992 Agreement is recorded at Deed Book 1353, Page 301. JX 20; *accord* JX 8 (2020 Servino deed for Lot 5 expressly referencing "COMMON DRIVEWAY AGREEMENT as set forth in Deed Record 1353, Page 301).

[50] JX 8. ("[T]hence from the point of Beginning, along lines of Lot 5, South 35° 40' 37" West, 205.21 feet to a point in Lot 6; thence by the same, North 56° 55' 33" West, 25.04 feet to a point in line of Lot 5; thence by the same, North 35° 40' 37" East, 205.21 feet to a point in line of Lot 4; thence by the same, South 56° 55' 33" East, 25.04 to the first mentioned point or place of Beginning.").

11

Thus, both the contemporaneous 1992 Agreement and the 1992 Deed for Lot 5 refer generally to the Drafted Driveway Easement for egress and ingress for Lots 4, 5 and 6, and then immediately provide that the easement is "particularly bounded and described" with specific metes and bounds consistent with the segment of the Present Driveway over Lot 5. Considering the circumstances, it seems that, in preparing the 1992 Deed for Lot 5 for the Lot 5 sale, the attorney may have copied the metes and bounds language from the 1991 DelDOT Plan for Lot 5 and then used the same text in preparing the contemporaneous 1992 Agreement.[51]

The 1992 Agreement is a recorded instrument.

As already indicated, the Present Driveway was unpaved when the parties entered in the 1992 Agreement. The evidence at trial shows that, at some point in the mid-1990s, the lot owners caused the crush-and-run driveway in the location of the Present Driveway to be paved.[52] And this is consistent with the purposes of the

---

[51] TT 28:8–13 (Harker) ("Yes. This metes and bounds description is identical to the metes and bounds description for [1991 DelDOT Plan] over Lot 5. So what this deed was saying, it is subject to that easement leading from Lot 6 across Lot 5 to Lot 4 that contained the existing driveway."); TT 214:9–24 (Davies) ("Q. From your review of Exhibit-- I believe it's 7, which is the DelDOT entrance plan, do you know if this plan shows how wide the driveway would be? A. It technically does not show the width of the driveway, the paved surface. That's what I'm referring to as the driveway -- but it shows the width of the easement that is shown on this plan. Q. And what's the width of that easement? A. This is a 25-foot easement, as described on this plan. Q. On the 1991 DelDOT plan it's 25 feet? A. Pardon me? Q. So that's a 25-foot easement in the 1991 DelDOT plan? A. Yes."); TT 83:4–10 (Harker) ("May I address that one question, if you'll allow me? This was done by [Attorney FT], who also did the deed for Lot 5. He had in his hand the description for Lot 5, and that's what he attached to this agreement instead of the entire description for that easement. That's my opinion what he -- what happened here.").

[52] TT 180:11–17 (Keith) ("Q. And you had sold all the properties -- you weren't a property owner on Lots 4, 5, or 6 by the time it was actually paved, were you[?] A. No. Q. So you were not involved with that process? A. No."); TT 152:22–153:2 (Bartel) (explaining his

12

1992 Agreement. The 1992 Agreement provides that the owners of Lots 4, 5, and 6 grant a perpetual easement for their mutual use of the Present Driveway for egress and ingress purposes and that the owners of the lots will pave and maintain the driveway "in good repair . . . ."[53]

## D. Keith Sells Lots 3 and 4

In January 1993, Keith sold Lot 3 to Lance and Madeleine Bartel.[54] The deed for Lot 3 expressly provides for an easement for the benefit of Lots 4, 5, and 6 in the location of the Drafted Driveway Easement.[55] The Lot 3 deed then immediately describes the easement "as shown on [the] unrecorded [1991 DelDOT Plan,]" with specific metes and bounds for "said easement" that track the Present Driveway's location on Lot 3.[56]

Later that same year, Keith sold Lot 4 to Robert and Winifred Wood ("1993 Deed for Lot 4").[57] The 1993 deed for Lot 4 provides for the land "as shown on the

---

parents built their house on Lot 3 "around 1997 or so, '96 maybe" and "we moved in probably '97 or '98"); TT 153:14-:15 (Bartel) ("As far back as I can remember, that road was paved.").

[53] JX 20 ¶¶ 1, 2–5, 13.

[54] Pre-Trial Stip. ¶ 16; JX 10.

[55] JX 10.

[56] *Id.* ("(2) thence North 56 degrees, 55 minutes, 33 seconds West, 22.36 feet to a point; thence by new lines through Lot No. 3, the three (3) following courses and distances: (1) North 29 degrees, 58 minutes, 32 seconds East, 31.66 feet to a point: (2) thence North 36 degrees, 06 minutes, 06 seconds East, 296.34 feet to a point, and; (3) thence North 33 degrees, 51 minutes, 29 seconds East, 297.42 feet to a point on the aforesaid Southwesterly side of Biddle's Corner Road, 40.00 feet from the center line thereof: and thence thereby, South 50 degrees, 56 minutes, 48 seconds East, 4.38 feet to the point and place of Beginning."); TT 32:7–13 (Harker); TT 231:21–232:4 (Davies).

[57] JX 12.

[Record Plan]."[58]  The deed contains no direct or indirect reference to the Present Driveway.

### E. Servinos and Dyers Move into Upham Downs Farm

In 2010, Kory Dyer purchased Lot 6 from the Wallicks' successors-in-interest to Lot 6.[59]  The deed for Lot 6 provides that the owners shall enjoy the "use and privilege of a . . . twenty (20) foot wide easement" as shown on the Record Plan.[60]

In 2012, James and Janina Servino purchased Lot 4 from the Woods.[61]  That 2012 deed for Lot 4 provides for the "same lands" that were conveyed to the prior owners in 1993, which includes the Drafted Driveway Easement on the Record Plan.[62]  Though the deed does not identify the 1992 Agreement, it does provide that the lot is "[s]ubject to any and all . . . easements and agreements of record in the Office of the Recorder of Deeds in and for New Castle County, Delaware."[63]

Mr. Dyer first met Mr. Servino shortly after Hurricane Sandy hit, when a tree fell along the Present Driveway.[64]  Mr. Servino assisted Mr. Dyer as they cut the tree

---

[58] JX 6.

[59] JX 5.  Robert and Joanne Hill purchased Lot 6 from the Wallicks in 2002.  JX 13. Jeffrey Hill purchased the lot from Robert and Joanne Hill in 2006.  *Id.*  Kory Dyer purchased Lot 6 from Mr. Hill in 2010.  *Id.*  Sumer Dyer was added to the deed in 2019.  *Id.*

[60] JX 13.

[61] JX 12.

[62] *Id.*

[63] *Id.*

[64] TT 95:1—12 (K. Dyer).

into pieces with a chainsaw.[65] At the time, Mr. Servino believed that the Present Driveway reflected the Drafted Driveway Easement.[66]

**F. The Driveway Dispute**

And so, the residents of Upham Downs Farms amicably shared use of and maintained the Present Driveway for many years.[67] That changed when James Servino built a recreational shooting range sometime in 2019.[68] The Dyers believed the range was on their property, and after an argument with Mr. Servino, called the police.[69]

The Servinos then conducted a re-survey of their property, which revealed that the Present Driveway was not within the 20 foot-wide easement set out in the Record Plan.[70] Days later, the Servinos' attorney sent the Dyers and Mr. Melancon, then-owner of Lot 5, a letter advising them that the Present Driveway would be closed off

---

[65] *Id.*

[66] TT 135:10–21 (James Servino).

[67] TT 127:17–24 (James Servino).

[68] TT 116:1–17 (James Servino). The record is not exactly clear when or where the range was built. Servino testified that "I had spoke to Kory Dyer about building a recreational shooting range over on the other side of the power line. There's a holler there. So it's probably about 20 foot down, 20 foot up . . . So I built the gun range. We were shooting there. There was no problems until Ms. Dyer came along. And all of a sudden, I wasn't allowed to go -- I got a letter saying -- or, no, I got a text, excuse me, saying that we had our property shown and marked, and the gun range is on their property and that they had concealed carry permits and I wasn't allowed over there." TT 116:12–117:6 (James Servino); *see also* TT 96:7 (S. Dyer) (explaining that Ms. Dyer came to live on the property after Mr. Dyer bought Lot 6). Based on how quickly events escalated from the building of the shooting range to the letter Servinos' attorney sent to the Dyers, the court assumes the year was approximately 2019.

[69] TT 120:7–15 (James Servino).

[70] JX 18. The Servinos conducted a partial survey of the land in 2012. JX 17.

for their ingress and egress.[71] The letter "enclose[ed] a copy of the [1992] Agreement that was signed by [the Wallicks and Melancons] . . . , which describes the easement."[72] In response, Kory and Sumer Dyer commenced this action on January 31, 2020, seeking in part a declaratory judgment and injunction for enforcement of an existing easement or easement by implication or prescription over the Present Driveway.[73]

The Servinos bought Lot 5 in the fall of 2020.[74] Mr. Servino testified that he purchased the lot, which is empty, as a site for his son to build a home.[75] Mr. Servino explained that the home has not been built yet since the outcome of the litigation would affect the location of the home.[76]

The 2020 Lot 5 deed sets forth a description of the property and provides it is:

the same lands and premises which Richard W. Keith, Jr., by Deed dated 6/16/1992 and recorded in the Office of the Recorder of Deeds in and for New Castle County, Delaware, in Deed Record 1350, Page 160 granted and conveyed unto Melvin J. Melancon and Joanne M. Melancon in fee.[77]

---

[71] JX 19.

[72] *Id.* The next (and final) sentence of the letter provides, "That is your only allowable ingress or egress to your property." *Id.* This referred to a long strip of meadow grass on the other side of the tree line.

[73] The Court granted the parties' request to transfer their tort claims to Superior Court under 10 *Del. C.* § 1902. Dkt. 220.

[74] JX 8.

[75] TT 114:1–11 (James Servino).

[76] *Id.*

[77] JX 8.

In short, this text references the 1992 Deed for Lot 5. The 2020 deed further lists various other recorded documents to which it is subject and expressly references the 1992 Agreement and the Record Plan.[78]

During this litigation, the Servinos installed a crush-and-run driveway approximately thirty feet east-southeast of the Present Driveway, in the location of the Drafted Driveway Easement, alongside Delmarva's power line easement ("New Crush & Run Driveway").[79] The Servinos have continued to maintain and improve the New Crush & Run Driveway.[80]

In addition, during the pendency of this litigation, police visits and motions to enforce status quo orders and for contempt have unfortunately characterized the parties' relationship.[81] The Dyers complained of the Servinos posting signs advising passersby of the dispute,[82] misplacing their packages, and installing various objects that clutter the Present Driveway.[83] As another example, the parties were unable to agree on snow plowing procedures—with a literal standoff on the driveway between

---

[78] *Id.*

[79] Pre-Trial Stip. ¶ 20; TT 125:15-16 (James Servino).

[80] TT 127:7–19 (James Servino).

[81] *See* Petitioners' Motion to Enforce Stipulated Status Quo Order and for Contempt Finding ("First SQO & Contempt Motion"), Dkt. 100; Petitioners' Motion to Modify Stipulated Status Quo Order and for Contempt Finding ("Second SQO & Contempt Motion"), Dkt. 179; Petitioners' Motion to Enforce Stipulated Status Quo Order and for Contempt Finding, Dkt. 226 ("Third SQO & Contempt Motion")

[82] First SQO & Contempt Motion, Exhibit E (signs posted stating, "COURT MEDIATION DIDN'T WORK IT'S OFF TO TRIAL NOW. THEY HAD MADE 'OUTRAGEOUS' DEMANDS! FREE-COPIES" and "POLICE CALLED 25 TIMES FOR A CIVIL MATTER. WHAT A WASTE OF YOUR TAX DOLLARS!")).

[83] *See* First SQO & Contempt Motion; Third SQO & Contempt Motion.

17

the litigants' plow-trucks—resulting in the Court holding argument on the parties' motion on the eve of a looming snowstorm.[84]  And, during the Court's site visit, the Court observed what can best be described as vaguely threatening, and certainly disquieting, detritus strewn by Mr. Servino along the length of the Present Driveway on Lots 4 and 5 and surveillance equipment pointed towards the Dyers' lot.  And the Dyers had reciprocal cameras pointed at the Servino's lot.  With such antagonism between the parties, the Court has encouraged resolution of the parties' dispute to little avail.

After significant motions practice, trial took place on May 30-31, 2024.  Following post-trial briefing, I heard argument on December 19, 2024.  The parties' counsel provided supplemental letters regarding, in part, the use of the New Crush & Run Driveway on April 3, 2025.

## II.  LEGAL ANALYSIS

The Dyers argue that an express easement exists over the Present Driveway and, if not, an easement by implication or necessity.  The Servinos disagree, arguing that the Dyers are not entitled to an express easement and are unable to establish that an easement by implication or necessity exists over the Present Driveway.  Proof of the existence of an easement requires a showing of clear and convincing evidence.[85]

---

[84] Second SQO & Contempt Motion; *id.*, Ex. C.

[85] *Buckeye Partners, L.P. v. GT USA Wilmington, LLC*, 2022 WL 906521, at *2, n.2 (Del. Ch. Mar. 29, 2022), *judgment entered*, (Del. Ch. 2022) (citation omitted); 3 Tiffany Real Property § 803 (3d ed.), Westlaw (database updated Sept. 2021) ("Although a plaintiff in a civil action normally must meet his burden by only a preponderance of the evidence, the plaintiff must overcome a higher clear and convincing standard to prove an easement.").

I first address whether any writing created an express easement over the Present Driveway. Deeds for both Lot 3 and Lot 5 include specific metes and bounds descriptions for an easement in the location of the Present Driveway over those lots. The heart of the dispute concerns Lot 4. As I describe below, the relevant contractual text is ambiguous. So, I look to extrinsic evidence and the relevant parties' course of dealing. But this still has analytical problems. Ultimately, I conclude that the question is resolved by the Dyers' alternative request for a declaration that an implied easement exists over the Present Driveway.

The evidence presented at trial clearly and convincingly demonstrates that the Dyers are entitled to an easement by estoppel. Although the Dyers did not specifically plead and pursue a theory of easement by estoppel, I do not find that to be fatal to the essential relief they seek.[86] They pled and pursued entitlement to an implied easement, of which an easement by estoppel is a variant.[87]

---

[86] "Delaware has adopted the system of notice pleading that the Federal Rules of Civil Procedure ushered in, which rejected the antiquated doctrine of the 'theory of the pleadings'— *i.e.*, the requirement that a plaintiff must plead a particular legal theory." *HOMF II Inv. Corp. v. Altenberg*, 2020 WL 2529806, at *26 (Del. Ch. May 19, 2020), *aff'd*, 263 A.3d 1013 (Del. 2021); Ct. Ch. R. 54(c) ("Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings.").

[87] 12 S.C. Jur. Easements § 12 ("Like easements by necessity, easements by estoppel are also sometimes referred to as 'easements by implication.'"); *Harris v. Limon-Nunez*, 2021 WL 8741647, at *4 (Del. Ch. Oct. 22, 2021) ("An easement may be created by implication, without a writing, if the surrounding circumstances indicate that the parties to a real estate transaction intended to convey an easement but failed to do so expressly.") (quotation omitted) (internal quotations omitted).

## A. Express Easement

"An easement is a non-possessory interest in real property, granted for a particular purpose, enforceable of right and not depend[e]nt for its continued existence on the will of the grantor."[88] "An easement can generally be created by express grant or reservation, by implication, or by prescription."[89] A finding of an express easement is proper if the deed or other writing "contain[s] plain and direct language evidencing the grantor's intent to create a right in the nature of the easement."[90] Evidence of an express grant of an easement "may be contained within the language of a deed or in a separate document."[91]

When interpreting a deed or separate writing, the court seeks to "ascertain and give effect to the intent of the parties as reflected in the language they selected."[92] No specific words are required so long as the writing clearly reflects the grantor's intent to create a right in the nature of an easement.[93] The court considers extrinsic evidence only if there is ambiguity in the deed or separate writing.[94] Extrinsic

---

[88] *Coker v. Walker*, 2013 WL 1858098, at *3 (Del. Ch. May 3, 2013) (citing 12 S.C. Jur. Easements § 1).

[89] *Sandie, LLC v. Plantations Owners Ass'n, Inc.*, 2012 WL 3041181, at *7 (Del. Ch. July 25, 2012) (citation omitted).

[90] *Black v. Staffieri*, 2014 WL 814122, at *2 (Del. 2014) (quoting *Judge v. Rago,* 1989 WL 25802, at *5 (Del.Ch. Mar.16, 1989), *aff'd Judge v. Rago,* 570 A.2d 253 (Del.1990)).

[91] *Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917, at *4 (Del. Ch. Nov. 5, 2004) (citation omitted).

[92] *Black*, 2014 WL 814122, at *2 (citation omitted).

[93] *Id.* (citing 25 Am. Jur. 2d. *Easements and Licenses* § 15 (2013)).

[94] *Judge v. Rago*, 570 A.2d 253, 257 (Del. 1990) ("When a contract is ambiguous, parol evidence may be used to determine the intent of the parties."); *id.* at 258 ("[A]n ambiguous conveyance may be found to contain an *express* easement if extrinsic evidence demonstrates

20

evidence may include "the overt statements and acts of the parties, the business context, prior dealings between the parties, and other business customs and usage in the industry."[95] A contract is ambiguous where a provision is subject to more than one reasonable interpretation.[96]

As noted, an express easement may be found in a deed or separate writing. Deeds for both Lot 3 and Lot 5 include specific metes and bounds descriptions for an easement for the benefit of Lots 4, 5, and 6 in the location of the Present Driveway over those lots.[97] The contemporaneous 1992 Agreement for the construction of, and easement over, a permanent, paved common driveway likewise includes a specific metes and bounds description of the Present Driveway, at least over Lot 5. Considering the evidentiary record before me, I have no difficulty concluding Lot 3 and Lot 5 are subject to an express easement for the benefit of the owners of Lot 6—*i.e.*, the Dyers—in the location of the Present Driveway.

---

that the parties intended that result. If no evidence can resolve the ambiguity, however, the terms of the conveyance will be construed in favor of the grantee, not the grantor.") (emphasis in original).

[95] *In re Explorer Pipeline Co.,* 781 A.2d 705, 714 (Del. Ch. 2001) (citation omitted).

[96] *BitGo Holdings, Inc. v. Galaxy Digital Holdings, Ltd.*, 319 A.3d 310, 323 (Del. 2024) (citation omitted).

[97] *See TMIP Participants LLC v. DSW Grp. Hldgs. LLC*, 2016 WL 490257, at *12 (Del. Ch. Feb. 4, 2016); *DCV Holdings, Inc. v. ConAgra, Inc.,* 889 A.2d 954, 961 (Del. 2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one."); *State v. Sweetwater Point, LLC*, 2017 WL 2257377, at *19 (Del. Ch. May 23, 2017) (quoting 4 Tiffany Real Prop. § 992 (3d ed.) ("[A] general description in a deed will usually yield to a specific description in another instrument incorporated in the deed by reference.")).

The dispute, then, centers on Lot 4. In particular, although the parties do not dispute that Lot 4 is subject to an easement in the location of the Drafted Driveway Easement, the parties very much dispute whether the lot is subject to an express easement in the location of the Present Driveway. Unlike deeds for Lot 3 and Lot 5, no Lot 4 deed includes specific metes and bounds description of an easement in the location of the Present Driveway over Lot 4. Indeed, neither the text of the Wood's 1993 Lot 4 deed, nor the Servino's 2012 Lot 4 deed expressly refers to an easement in the location of the Present Driveway.

The Servino's 2012 Lot 4 deed, however, does provide that it is subject to all "easements and agreements of record in the Office of the Recorder of Deeds in and for New Castle County, Delaware."[98] And the parties do not dispute that the Lot 4 deed is subject to the recorded 1992 Agreement.[99] Instead, they tangle over the proper interpretation of the 1992 Agreement.

The Servinos argue that the 1992 Agreement should be read as referring to an easement for a paved driveway solely in the location of the Drafted Driveway Easement. The Dyers, on the other hand, argue that the 1992 Agreement should be read as referring to an easement in the location of the entirety of the Present Driveway.

---

[98] JX 12.

[99] *See also* JX 19 (Servinos' counsel writing, "I am enclosing a copy of the [1992] Agreement that was signed by your predecessors in title on June 19, 1992, which describes the easement.").

22

To begin, the 1992 Agreement is ambiguous.[100] The 1992 Agreement provides that "this grant of easement shall be perpetual and [ ] run with the land and [ ] be binding on and [ ] inure to the benefit of the Owners hereto, their and each of their heirs, successors or assigns."[101] But the 1992 Agreement identifies two different locations for the paved-common-driveway easement. In one part, it refers to an easement as found in the Record Plan—*i.e.*, the Drafted Driveway Easement. In another, it identifies the metes and bounds of "said easement" as the location of the Present Driveway over Lot 5. Based on the easement descriptions alone, one might conclude that parties to the 1992 Agreement contracted for an express easement either in the location of the Drafted Driveway Easement or in the location of the Present Driveway, but only over Lot 5.

In terms of the extrinsic evidence presented at trial, I consider that Keith, as former owner of Lot 4 and signatory to the 1992 Agreement, testified that the parties to that agreement intended the paved driveway, and driveway easement, to be located where the Present Driveway is.[102] His testimony is supported by contemporaneous

---

[100] *See* Summ. J. Ruling at 16:18–22, Dkt. 77 ("At least at this summary judgment stage, it seems to me that I cannot conclude anything other than that, as was stated in *Judge v. Rago*, the 1992 Agreement and its interplay with the various deeds are 'hardly models of clarity.'").

[101] JX 20 ¶ 13.

[102] TT 163:17–22 (Keith) ("A. Not really, no. I was under the assumption it was recorded. But at the same time, it was also all agreed upon between the owners of the lots that this was where the road was going to go because of just how expensive the cost was to put the road in."); TT 167:3–13 (Keith) ("Was it your intent to have this 'Existing Driveway,' as shown here on the map, meant to be the permanent driveway and access points for Lots 4, 5, and 6? A. After we completed the road, we determined that it was going to be the permanent road because it was just such a mess to try to get back through the trees and the root systems and cut out all that and put in a base. It was so much more work that we decided

documentary evidence in that the same-in-time Lot 5 deed includes a metes and bounds description consistent with the Present Driveway over Lot 5. In addition, the unrecorded 1991 DelDOT Plan that Keith caused to be prepared shows the location of the Present Driveway over Lots 3, 4 and 5. Trial testimony shows that plan was prepared to obtain "curb cut" permits to access Port Penn Road—a necessary feature of a subdivision driveway.[103] And the January 1993 deed for Lot 3, which Keith signed six months after the 1992 Agreement, describes Lot 3 as subject to the easement in the unrecorded 1991 DelDOT Plan.[104]

The Servinos point to little countervailing evidence. Mainly, they point to the contemporaneous documents' general references to the Record Plan. That creates ambiguity, but it does not resolve it. The Servinos fail to explain in any remotely persuasive way why the contemporaneous documents repeatedly include specific metes and bounds descriptions for an easement in the location of the Present Driveway. And, of course, there is the fact of the paved common driveway's location for the last three decades or so.

On balance, the record before me seems clear that the parties intended in the early 1990's to create an express, paved, and perpetual easement for the benefit of

-- at the time we were, like, nobody is going to want to move this, make it a formal road."); TT 165:8–12 (Keith) (testifying that the 1992 Agreement was drafted for a paved driveway in the location of the then-existing crush-and-run version of the Present Driveway, as "people, they didn't want to buy a property and then have to put another road in and all the expense and costs to the road in. It would have just made a mess to try to move the road after the fact because when you do all that crush and run and crushed concrete, all the stuff to put -- you know, it would have been a mess to try to move it.").

[103] TT 55:1–8 (Harker).

[104] JX 10.

24

Lots 4, 5 and 6 in the location of the Present Driveway. The problem is that, at least with respect to Lot 4, no document actually says that.

I reject the Servinos' suggestion that the 1992 Agreement refers in no part to the paved Present Driveway. The notion that it should be read only as confirming the Drafted Driveway Easement—a strip of meadow and forest land—seems frankly absurd. Likewise absurd is the notion that the 1992 Agreement only creates an express easement for a paved common driveway in the location of the Present Driveway over Lot 5. Such a road-to-nowhere cannot be what the parties intended.

And yet, interpreting the 1992 Agreement naturally as referring to the entire length of the Present Driveway seems to stray from simply picking between reasonable interpretations of the written text. Instead, it would seem at least arguably more akin to reforming the parties' written words.

In point of fact, the evidence suggests that, notwithstanding the unrecorded 1991 DelDot Plan showing the difference, the drafters in the early 1990s may have, at various points, been mistaken as to whether the easement for the Present Driveway was located within the easement shown on the Record Plan. This is not altogether surprising, given that the Drafted Driveway Easement and the Present Driveway are only approximately thirty feet apart. If true, this would explain the contemporaneous documents' repeated comingling of references to the Record Plan and to metes and bounds descriptions of segments of the Present Driveway. And this sort of confusion is further consistent with Keith's and even Mr. Servino's trial testimony.

Or perhaps the discrepancy is inexplicable except for want of attention to detail and lack of due regard for paperwork. Keith was in his twenties, and Upham Downs Farms was his first subdivision development.[105] The 1992 Agreement's inclusion of metes and bounds only for Lot 5 may simply have been a product of sloppiness, whether by Keith, counsel, or the surveyor, or all three.

Rather than proceed further down this analytical rabbit hole, I move instead to the question of an implied easement. And here, for the reasons I describe below, our case law provides the answer.

## B. Easement By Estoppel

"[A]n easement by estoppel is created when 1) a promisor's representation that an easement exists has been communicated to a promissee; 2) the promisee believes the promisor's representation; and 3) the promisee acts in reliance upon the promisor's representation."[106] Claiming an "interest in land based on an oral agreement or a course of dealing" requires proof of "very strong evidence . . . leav[ing] the court with the same degree of certainty that a formal written contract ordinarily provides."[107] Such a license to "use land can vest enforceable rights in the grantee if the court is convinced that the grant of use was reasonably relied upon and that the parties intended the grant to be permanent."[108]

---

[105] TT 178:20–179:23 (Keith).

[106] *K & G Concord, LLC v. Charcap, LLC*, 2017 WL 3268183, at *8 (Del. Ch. Aug. 1, 2017) (quotation omitted).

[107] *Hionis v. Shipp*, 2005 WL 1490455, at *5 (Del. Ch. June 16, 2005), *aff'd*, 903 A.2d 323 (Del. 2006).

[108] *Id.* (citations omitted).

26

*Hionis v. Shipp* is instructive.[109]  Then-Vice Chancellor Strine found that the defendants were entitled to an easement by estoppel over a driveway that intersected the plaintiff's property.  The dispute concerned the use of a deer hunter's path on land owned by the plaintiff's predecessor-in-interest that later became a driveway.  To start, the defendant purchased adjoining land.  But, before doing so, the defendant obtained permission to use the footpath that crossed the neighbor's land to access a public roadway.[110]  Joint improvements of the footpath followed.[111]  The defendant later extended the path, built a driveway on it, and built his home on his property.[112]  The parties did not record a formal easement at the time because both believed that the defendant's deed already referred to it in a survey filed with the deed.[113]  The survey, however, tracked a different location on the property, and not where the footpath actually was.[114]

The defendant in *Hionis* later attempted to memorialize the easement through a recorded agreement, but for technical reasons was unsuccessful.  When the defendant divided his purchased land into a subdivision, he extended the driveway and the relevant parties prepared an easement agreement correctly tracking it.[115]  Unfortunately, this easement agreement was neither executed nor filed in time before

---

[109] *Id.*

[110] *Id.* at *2.

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] *Id.*

27

the plaintiff contracted to purchase the adjoining property.[116] Another easement agreement was later recorded but, as with the deed, it did not track the location of the driveway.[117]

In spite of these technical defects, the evidence clearly and convincingly showed the defendant and the plaintiff's predecessor-owner of the adjoining land intended to create an "enduring privilege" over the footpath.[118] The record further showed that the defendant relied upon the predecessor's representations to the defendant's detriment by extending the path, building a driveway over it, constructing a home on his property, recording a subdivision plan and entering into a commercial transaction—all reflecting continued and permanent use of the easement.[119] Accordingly, the Court found that the defendant was entitled to an easement by estoppel over the driveway.[120]

So too here. Whether before or soon after selling Lot 6 to the Wallicks in 1989, Keith constructed an unpaved driveway in the location of the Present Driveway for them to access their lot and build their home.[121] Keith's testimony confirmed that

---

[116] *Id.*

[117] *Id.*

[118] *Id.* at *5.

[119] *Id.*

[120] *Id.* at *6.

[121] Upon selling Lot 6 to the Wallicks, Keith allowed for them to drive over Lots 4 and 5, which he then owned, to access their property and build their house. TT 162:20–24 (Keith). Thus, whether by course of dealing or oral agreement, the evidence shows that, at a minimum, an implied agreement existed at that time for the owner of Lot 6 to use the unpaved driveway Keith constructed. This would be treated as a revocable license absent evidence of intent to create an enduring privilege or fraud. *Carriage Realty Partnership v.*

28

this would, quite obviously, be an important feature for anyone buying a lot in his subdivision.

Soon thereafter, Keith sold Lots 3, 4 and 5. In connection with this process, he caused an agreement for a perpetual paved driveway easement for the benefit of Lots 4, 5, and 6 to be prepared and executed among the owners of those lots and recorded. The 1992 Agreement provided for the lot owners to share the cost of constructing and maintaining the paved driveway. And the agreement provided that "[t]his grant of easement shall be perpetual and shall run with the land and shall be binding on and shall inure to the benefit of the [present and future owners of Lots 4, 5 and 6], their and each of their heirs, successors or assigns."[122]

The paved Present Driveway is of significant length. And the trial testimony showed that the cost to pave that driveway would have been substantial.[123]

Trial did not feature testimony from a lot owner at the time about the payment of paving costs.[124] Given the decades that have passed, this is not surprising. Keith no longer owned the lots when the Present Driveway was paved.[125] And Alexander

---

*All-Tech Auto,* 2001 WL 1526301, at *1 (Del. Ch. Nov. 27, 2001). To the extent the Wallicks held only a revocable license at first, the evidence shows the parties intended the lot owners' rights of ingress and egress to be perpetual by no later than the 1992 Agreement.

[122] JX 20, Recitals (definition of "Owners"); *id.* ¶ 13.

[123] TT 245:12–20 (Davies) ("THE COURT: . . . Is that an expensive undertaking? THE WITNESS: To put a new driveway in? Yes, it is. Depending on how long it is in particular and how thick it is and wide it is, et cetera."); TT 249:7–18 (Davies) ("THE COURT: Okay. So does paving a driveway involve lots of machinery, and folks are out there for a very substantial amount of time? THE WITNESS: Yes. THE COURT: Does it involve significant expense? THE WITNESS: Yes.").

[124] *See, e.g.*, TT 152–154 (Bartel).

[125] TT 180:11–17 (Keith).

Bartel, who lived on Lot 3 in the 1990s, was a child when the driveway was paved and understandably did not know or recall the details. Besides, the Bartels, as the owners of Lot 3, were not responsible for paving or maintaining the driveway under the 1992 Agreement.[126]

And yet, the circumstantial evidence convincingly shows what occurred. Just as a wet sidewalk and people carrying umbrellas can serve as circumstantial evidence of rain, the paved driveway and absence of a structure on Lot 5 convincingly shows that the owners of Lot 6 paid at least the one-third of the cost of paving required by the 1992 Agreement they signed.[127] Indeed, it would be unsurprising if they ended up paying more given the Melacons' presumable lack of interest in paying to pave a driveway for the benefit of their empty Lot 5. And, along those lines, there would be no obvious reason for the Woods, as then-owners of Lot 4, to pay more than their one-third share of the paving costs solely to run a paved driveway well past their lot, to Lot 6.

Thus, the circumstantial evidence compels the conclusion that the owners of Lot 6 relied on the promise of a perpetual, paved-driveway easement for their benefit, as reflected in the 1992 Agreement, in exchange for paving and maintaining the Present Driveway. The owners of Lot 6 did not do so simply so that an owner down the road could, at his leisure, cut off access.

---

[126] TT 152:1–12 (Bartel).

[127] *See* JX 20 ¶ 5.

30

The Wallicks built their home on Lot 6, shared the cost in paving and maintaining the road, and the Dyers, as the Wallick's successors-in-interest, shared in the cost of maintaining the road. Once an owner relies to her detriment on an easement having been created and the evidence shows the owner was relying on the perpetual nature of that easement, then an easement appurtenant to the land exists.

As successors-in-interest to Lots 4 and 5, the Servinos cannot now claim, multiple decades later, that no easement exists over a plainly visible driveway in these circumstances because of ambiguity and incomplete metes and bounds in the 1992 Agreement. The Present Driveway was visible to them when they purchased both Lots 4 and 5, and they even shared in the maintenance and repair of the road for several years.

The 1992 Agreement, like the documents in *Hionis*, suffers from a technical defect in its description of the agreed-upon, otherwise-express easement for a paved driveway in the location of the Present Driveway. But the record presented at trial clearly and convincingly establishes the Dyers' entitlement to a perpetual easement by estoppel for the benefit of Lot 6 in the location of the Present Driveway.[128]

---

[128] Because I find that an implied easement exists over the Present Driveway, I do not reach the question of whether an easement by prescription exists. Even so, the Dyers have not proven that use of the Present Driveway was hostile.

## C. Injunctive Relief

To obtain a permanent injunction, the Dyers must show (1) actual success on the merits, (2) irreparable harm, and (3) that the balance of the equities weighs in favor of issuing the injunction.[129]

The Dyers contend that they are entitled to a permanent injunction. They claim that they will suffer financial harm in adjusting to using the New Crush & Run Driveway.

The Dyers are entitled to a permanent injunction for the entirety of the Present Driveway. They have met their burden in showing that an easement exists over the Present Driveway. They have also demonstrated irreparable harm. The Dyers have relied on the use of the Present Driveway since 2010, investing resources in its maintenance and repair.[130] Using the New Crush & Run Driveway is not an equivalent substitute to using a paved, asphalted roadway. Indeed, the 1992 Agreement states that "direct access to this easement is superior and paramount to the rights of any of the Owners."[131]

Finally, the balancing of equities weighs in the Dyers' favor. The owners of Lots 4, 5, 6 have been using and maintaining the Present Driveway since the 1990s and, given that an enduring easement exists over the Present Driveway, the Dyers are entitled to enjoy the use and privilege of that easement.

---

[129] *Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at \*25 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010) (citation omitted).

[130] *See* TT 86:4–7, 94:20–95:12 (K. Dyer).

[131] JX 20 ¶ 2.

## III. CONCLUSION

For the foregoing reasons, the Court concludes that an express easement for the benefit of Lot 6 exists over Lots 3 and 5 in the location of the Present Driveway and an easement by estoppel for the benefit of Lot 6 exists over the entire length of the Present Driveway. A permanent injunction will be entered against the Servinos to enjoin and restrain them from impeding the Dyers' access to the Present Driveway. The parties will confer and file a proposed form of implementing order within ten days.